Joshua M. Lurie, Esq. (0788)
Lurie|Strupinsky, LLP
15 Warren Street, Suite 36
Hackensack, New Jersey 07601
(201) 518-9999 (main)
(347) 772-3074 (facsimile)
Attorney for Plaintiffs

| | |
|---|---|
| NYC MEDICAL PRACTICE, P.C. d/b/a GOALS AESTHETICS & PLASTIC SURGERY and NYC MEDICAL PRACTICE IP HOLDINGS, CORP., <br><br> Plaintiffs, <br><br> v. <br><br> DAVID SHOKRIAN; DAVID SHOKRIAN, P.C. (a New York Professional Corporation); MILLENNIAL PLASTIC SURGERY, PLLC (a New York Professional Limited Liability Company); FARAI MAKONI; IRINA KHAIMOVA; EUROPEAN BEAUTY CENTER; EBC PLASTIC SURGERY; ISIS RICHARDSON; SURGERY411 (a fictitious Instagram profile); CHRISMARY RODRIGUEZ; NATASHA LOBRANO; JOHN DOES 1-50; and BUSINESS ENTITIES A-K, <br><br> Defendants. | UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK <br><br> Civil Case No. <br><br> COMPLAINT, JURY DEMAND AND DESIGNATION OF TRIAL COUNSEL |

Plaintiffs, NYC MEDICAL PRACTICE, P.C. d/b/a GOALS AESTHETICS AND PLASTIC SURGERY and NYC MEDICAL PRACTICE IP HOLDINGS, CORP. ("Goals"), by way of complaint against the Defendants, says:

## **PARTIES**

1.     Plaintiff NYC Medical Practice, P.C. d/b/a Goals Aesthetics and Plastic Surgery is a New York professional corporation, incorporated pursuant to the laws of the State of New York,

and having headquarters in Kings County, New York and its principal location in New York County, New York.

2.      Plaintiff NYC Medical Practice IP Holdings, Corp. is a New York for-profit corporation, incorporated pursuant to the laws of the State of New York, and having headquarters in Kings County, New York and its principal location in New York County, New York.

3.      Defendant David Shokrian ("Shokrian") is, upon information and belief a resident of the City of New York. He is named herein in his individual and personal capacity as well as in his official capacity as the sole owner or proprietor of Defendant David Shokrian, P.C. and also as the managing or controlling member of Defendant Millennial Plastic Surgery, PLLC ("Millennial"), located in the City and State of New York and having a principal location at 128 East 62nd Street, New York, New York.

4.      Defendant Farai Makoni ("Farai") is, upon information and belief, a resident of the City of New York, in Kings County and is servable at 247 Starr Street, Apt. 3L, Brooklyn, New York 11237.

5.      Defendant Irina Khaimova ("Irina") is, upon information and belief, a resident of the City of New York, in Kings County and is servable at 1115 Flatbush Avenue, Brooklyn, New York 11226.

6.      Defendant European Beauty Center and EBC Plastic Surgery ("EBC") are, upon information and belief, a fictitious entity that operates as an illegal spa and an illegal surgical center within a furniture store and is owner and/or operated by Irina, staffed by Farai, and has since retained or is working in conjunction with Shokrian as described more in depth below.

7.      Defendant Isis Richardson ("Isis") is, upon information and belief, a resident of the City of New York, in Bronx County, and is servable at 1178 Clay Avenue, Apartment 2S,

Bronx, New York 10456.

8.      Defendant Surgery411 is an Instagram profile operated by Isis.

9.      Defendant Chrismary Rodriguez ("Chrismary") is a former employee of Goals and, upon information and belief, a resident of the City of New York, in Bronx County, and is servable at 2448 University Avenue, Apartment 1B, Bronx, New York, 10468.

10.     Defendant Natasha Lubrano ("Natasha") is a former employee of Goals and, upon information and belief, a resident of the City of New York, Richmond County, and is servable at 40 Radford Street, Staten Island, New York 10314.

11.     The John Doe and Business Entity defendants are fictitious parties named herein because their identities are not currently known, and are used to represent individuals involved in the conduct set forth herein as well as, potentially, the owners, operators, employees, directors, managers and individuals or business entities with controlling interests in Defendants, if any such exist and whom or which, after discovery, may be determined to be partially or otherwise responsible for the harm which the Plaintiff suffered and therefore an amended Complaint would be necessary to name them.

## **NATURE OF THE ACTION**

12.     This is an action for violations of multiple federal laws, including copyright infringement pursuant to 17 U.S.C. § 504, trademark counterfeiting, trademark infringement, trademark dilution, and cybersquatting brought pursuant to Sections 32, 43(a), 43(c) and 44 of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and (c),; Violations of the Defend Trade Secrets Act, 18 U.S.C. 1836, et seq.; Civil Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq.; and Violations of the and causes of action under Sections 349, 350, and 360-l of the New York General Business Law, and for violations of the common law.

13.     The common law claims arise under, *inter alia*, allegations of common law trademark protections, fraud and fraudulent conduct, violations and breaches of employment and consultant agreements, trade libel, conversion, conspiracy and other offenses.

14.     Many of the common law claims arise under the permissive joinder provisions of Fed.R.Civ.P. 20, as the issues therein are intertwined with the statutory and federal claims, and a full adjudication of all issue against all parties would simplify the claims, eliminate the risks of contradictory rulings, and would be in the best interest of justice and judicial efficiency.

## JURISDICTION AND VENUE

15.     This Court has Subject Matter Jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 as violations of the Lanham Act including trademark infringement and dilution, the Computer Fraud and Abuse Act for improper access and theft of documents and the Defend Trade Secrets Act for theft of trade secrets and misappropriation thereof, and conspiracy to do so as well as the Racketeer and Influenced and Corrupt Organizations Act.

16.     The Court has Supplemental Jurisdiction, pursuant to 28 U.S.C. § 1367 for the New York statutory claims and the common law claims. Similarly, the Court has Subject Matter Jurisdiction over the New York Business Law claims under 28 U.S.C. § 1338.

17.     The Court has personal jurisdiction over Defendants as they are either a resident of the State and City of New York or their principal business is located within the State and City of New York.

18.     Venue is proper in this Judicial District under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claims herein are within this district.

19.     Further, venue is proper in this Judicial District as a result of the contractual agreement which is a subject of this matter granting exclusive jurisdiction to either the state or

federal courts located in Kings County, New York and, due to the federal claims to which this Court has exclusive Subject Matter Jurisdiction, this Judicial Venue is proper.

## FACTS

### A. The Background of the Trademarks.

20.     Goals is an established and reputable plastic surgery center which has experienced notable business growth during approximately the last year.

21.     Among the acts that Goals has done in order to maximize its value is through the protection of its intellectual property.

22.     Indeed, contrary to other forms of medical practice, plastic and cosmetic surgery is a competitive business where image is very important, and the use of social media is key for its advertising.

23.     The social media platform, Instagram, is one of the most important advertising platforms as it allows such medical practices as Goals to put "before and after" photographs and other images or videos for the purpose of showing the quality of their work.

24.     Similarly, many patients and prospective patients utilize the platform for this same purpose.

25.     Many similar practices even retain outside social media coordinators or companies to do massive amounts of social media advertising.

26.     As a result, it is important for a medical practice, such as Goals, to distinguish itself.

27.     Therefore, it needed to take action to protect its legal alternative name, Goals Aesthetics and Plastic Surgery, from improper use by other entities. In sum, "Goals" as a term in social media and plastic surgery, is very valuable.

28.     On December 4, 2017, Goals, through its IP Holding Company, applied to trademark "GOALS AESTHETICS AND PLASTIC SURGERY" for the use in Medical spa services, namely, dermal filler injections, botulinum toxin injections, platelet rich plasma injections, stem cell therapies, sclerotherapy being vein removal treatment, intravenous vitamin injections, detoxification therapies, non-surgical body shaping, cellulite treatment, hormone replacement therapy, laser hair removal services, and laser treatments for the face and body; dermatology services, namely, skin tag removal and pigmentation treatments; cosmetic skin care services, namely, facials, chemical peels, microdermabrasion, and mesotherapy; surgical body shaping and cosmetic and plastic surgery with no claims as to the exclusive use of "Aesthetics & Plastic Surgery" apart from the mark as shown (the "Mark").

29.     This character mark has been given Serial Number 87707536.

30.     Although the Mark is still pending, as of December 17, 2018, the Mark was scheduled for the Statement of Use (SOU) evidencing that the Mark will likely be finalized in the near future.

31.     No opposition has been filed against Goals' use of the Mark.

32.     Notwithstanding, consistent with New York and common law, the Mark, along with a common law graphic mark:



33.     Goals diligently protects these trademarks, notwithstanding the pendency of the final ownership, including its common law trademarks and other intellectual property.

34.     Further, Goals continually monitors social media and other platforms for those who

violate the Mark and the common law trademarks.

**B.**   **The Background of Farai**

35.   Defendant Farai was hired as a full time "videographer and social media manager" for Goals in early 2018.

36.   As a condition of employment, Farai was presented with, and on February 1, 2018, fully executed, a copy of Plaintiff's "CONFIDENTIALITY, INTELLECUTAL PROPERTY & TRADE SECRETS AGREEMENT" (the "Confidentiality Agreement").

37.   Thereafter, on March 8, 2018, Farai signed an acknowledgement that she would be subject to Plaintiff's terms and conditions of employment and confidentiality agreement (the "Agreement"). **Exhibit A**.

38.   On or about October 4, 2018, Farai quit on short notice.

39.   Thereafter, Farai went to work with Defendants Irina and EBC, and, as later learned, with Shokrian.

40.   While employed by Goals, Farai refused to use a computer as provided by Goals as Farai was principally an Apple user and Goals provided Microsoft based computers for employees. As a result, and to perform the duties to which she was directed and for which she was employed, Farai used her own personal computer.

41.   Farai, as a result, placed hundreds, if not thousands, of documents, photographs, images, videos, forms, and other intellectual property and/or trade secrets of Goals on her own personal computer.

42.   Similarly, as part of her position with Goals, she was to set up various social media and other web presence accounts including a YouTube channel.

43.   Unbeknownst to Goals, Farai failed to comply with Goals' requirements for the

creation of such accounts, created them attached to her personal emails, and retained passwords.

44.     Farai refuses to provide the log-in information or passwords for these accounts including Goals' YouTube channel which is pursuant to the intellectual property rights of Goals.

45.     Shortly after Farai quit, demand was made to return all documents and passwords and other intellectual property. Farai ignored the demand.

46.     Instead, Farai called Goals' operations manager and made multiple accusations, threats and other comments, including discriminatory against people of certain religions of which the principal of Goals is a member, and otherwise acted hostile and truculent.

47.     A second demand was made, through counsel, to return all documents and information. This request was ignored.

48.     Upon information and belief, Farai retains Goals' intellectual property and is using it for her own, or her new employer's benefit.

49.     Farai has contacted employees of Goals and attempted to solicit them to leave their employment with Goals and join her at her new place of employment.

50.     Similarly, the trade secrets to which she was privy, upon information and belief, have been used by her for the benefit of her new employer in violation of the Agreement.

51.     Further, the Agreement contains non-compete provisions which are currently being violated as a result of EBC as discussed further below.

52.     And further, the Agreement contains non-solicitation and non-piracy clauses which Defendant has violated as set forth herein.

   C.  **Background of Irina.**

53.     Defendant Irina operates a "salon" in Brooklyn - EBC.

54.     In late 2017 and into early 2018, many of Goals' clients advised that they obtain

massages, makeup and/or microblading services from Irina and EBC.

55. Seeing a mutually lucrative business potential, Goals reached out to Irina and inquired whether she would be interested in providing such services for Goals' patients at Goals' locations both in Brooklyn and in Manhattan. Irina was similarly interested in this potential business agreement.

56. For no specific reason, in early to mid-2018, Goals found that it did not need the services of Irina and ceased inquiring whether she would be interested in performing such spa services on Goals' patients.

57. The decision to terminate the agreement with Irina was not with malice or any ill wishes, but a simple business decision.

58. Notwithstanding the lack of ill will, Irina became incensed at the lack of services being requested and began a campaign of harassment towards Goals' owner and operators. However, since it was generally benign – or as they thought – Goals took no action other than to block Irina's phone from texting to Goals' owners and operators.

59. Notwithstanding, upon information and belief, Irina was conspiring and taking action against Goals.

60. As discussed above, Farai quit on short notice and began to work for Irina at her "salon" - EBC.

61. Upset at the fact that Farai had violated her contract, as discussed above, Goals sent a representative to EBC to determine whether there was a violation of Exhibit A. What the found was shocking.

62. EBC was not a spa at all, it was in the back of a furniture store and made to look like a salon and surgical center.

63.     Goals, learned, and through information and belief, that EBC and Irina had hired unlicensed "doctors" from eastern Europe to perform surgery in this unlicensed surgical center.

64.     Shortly after this investigation, Irina sent a text to Goals' principal's spouse in Russian stating, paraphrased, to stop sending rats to her salon.

65.     While Goals was prepared to deal with the issues with Farai and Irina, as well as EBC directly, as a result of the conduct of Shokrian, as discussed below, the need to bring this matter consolidated became evident.

**D.  The Background of Shokrian**

66.     David Shokrian is, upon information and belief, a board-certified plastic surgeon.

67.     In approximately June or July of 2018, he made an unsolicited telephone call to Goals advising that he found Goals either in the Plastic Surgery new or some board and wanted to come in to interview.

68.     Shokrian was offered an interview and came in for one.

69.     Shortly thereafter, Shokrian was offered employment with Goals as a full-time plastic surgeon.

70.     Shokrian then advised that he had no interest in being employed and, instead, had his own business, Shokrian, P.C., and wanted to provide services and surgeries on an "as needed" basis as an independent contractor.

71.     Shokrian was offered a proposed independent doctors' agreement which was modified through an arms-length negotiation with Shokrian's counsel as well as Goals' counsel.

72.     The agreement was signed an entered into on or about July 31, 2018. (**Exhibit B**).

73.     Among the salient terms, and as relevant to the within matter, include, but are not limited to:

a. Section 14(C) – "The parties agree to conduct his or her business in accordance with the rules, policies and procedures of the Practice";

b. Schedule C, the intellectual property terms, in its entirety but, more specifically Section 4 and 5; and

c. Schedule D, the non-solicitation agreement as discussed more in depth below.

74. Further, rather than execute the agreement through Shokrian, P.C., Defendant Shokrian advised that he was executing the agreement, Exhibit B, through Millennial Plastic Surgery, P.C.

75. Shokrian began providing services for Goals on August 1, 2018.

76. Being hungry, Shokrian continually asked to perform more surgeries for Goals and, by mid-October 2018, he was performing as many as three or four surgeries per day, five to six days per week and making as much as $20,000.00 in a given week.

77. Again, as he was effectively full time, Shokrian was asked if he wanted to be an employee. He refused.

78. Shokrian continued to provide services until approximately December 8, 2018 as discussed more in depth below.

**E. Background of Isis and Surgery411**

79. Beginning in late 2017, Isis was volunteering for Plaintiff as a social worker in an advertising program called "Revamp Your Look" and, thereafter, provided further volunteer work in return for professional services by Plaintiff valued in the several thousand-dollar range.

80. Goals found Isis because she was what some refer to as an "influencer" – someone who, through social media, can influence people's use of products or services.

81. Her principal social media platform was, and is, Instagram where she operates a

profile called "Surgery411" which is a defendant herein.

82.     Surgery411, as an alter-ego of Isis, discusses on social media plastic surgery clinics and their doctors.

83.     On or about January 16, 2018, Plaintiff offered Isis a position as office/operations manager for their new location to which they intended to open at a rate deemed commensurate with the experience of Isis.

84.     Isis rejected the offer, made no counteroffer and left the employ of Plaintiff.

85.     Thereafter, in January and February of 2018, and using her background and experience on social media, including Instagram, Isis began a campaign of harassment and defamation against Plaintiff.

86.     Included thereto was Defendant making telephone calls to Plaintiff's employees and posting on her own and Plaintiff's and Plaintiff's employee's social media pages defaming Plaintiff, its principal/doctor, employees and the principal's family. Among these defamatory statements were:

   a.   Plaintiff's principal's wife is a scammer without "principle, honesty, [or] respect."

   b.   That Plaintiff stole its logo;

   c.   That Plaintiff was falsely advertising that it had performed surgeries, alleging other doctors performed the surgery, when, in fact, the surgery was performed by Plaintiff; and

   d.   Claiming that Plaintiff committed racial discrimination by, inter alia, offering a salary which was lower and predicated on race.

87.     As a result, Plaintiff sought an injunction against Isis in the Supreme Court of New

York, Bronx County, under Index Number 22265/2018E.

88.     After adjudicating the action for a preliminary injunction, Isis appeared to have disappeared and stopped harassing or bothering Plaintiff – until recently as discussed below.

### F.  Background of Chrismary

89.     Chrismary was hired as a patient coordinator on behalf of Plaintiff with her principal duties of speaking to potential patients, discussing services, and then, if a patient decides to obtain a service from Goals, be their direct contact on behalf of the Practice.

90.     Chrismary was, unfortunately, not properly suited for the position – frequently being surly with patients or otherwise not properly able to perform her job.

91.     As a condition of her employment, Creamery was caused to sign acknowledgment of being bound to Plaintiff's terms and conditions of employment which include, *inter alia*, certain terms which are identical to those of Farai and set forth in Exhibit A.

### G.  Background of Natasha

92.     Natasha was hired as a patient coordinator for Goals, by and through its former associated name, in or about July of 2017.

93.     As with the other employees of Goals, Natasha signed various documents as conditions of employment. Among them was, on or about January 2, 2018, a non-solicitation agreement.

94.     In late summer of 2018, Natasha advised Goals that she was leaving Goals due to some family circumstances.

95.     Shortly thereafter, Goals became aware, and it was confirmed directly by Natasha, that she was "freelancing" as a patient coordinator, being paid, illegally by other practices, a percentage of work diverted to them.

96.     Among those patients that Natasha was contacting were those who expressed an interest in having treatment provided by Goals thereby violating the non-solicitation agreement.

**H. Goals' Photographs and Copyrights**

97.     An element of Goals' growth has been the result of a concentrated marketing program which includes, consistent with signed waivers from patients, the posting of "before and after" photographs of their patients on social media and elsewhere to show the quality of the services provided.

98.     Plaintiff has taken hundreds, if not thousands, of photographs which are designated to be used solely for its own benefit pursuant to the authorization of the patients of whom the photos are taken.

99.     As a result of the growth, Plaintiff sought additional, qualified, surgeons to perform surgeries on behalf of Goals either as employees or as independent contractors with Shokrian being one such surgeon.

100.    In approximately late-November or early-December 2018, Goals' management decided to look at Shokrian's Instagram page, something they had not done before, only to learn that they were "blocked" from viewing it.

101.    As a result, they had an employee of Goals open the page and were shocked at what they discovered.

102.    Therein, and beginning in September 2018, Shokrian, on the Instagram "Millennial Plastic Surgery," had posted no less than 15 of Goals' before and after photographs which, pursuant to Exhibit B, Section 4, Shokrian knew was the exclusive intellectual property of Goals and not Shokrian.

103.    Some of these pictures were taken directly from Goals' own Instagram pages and

were altered or modified to remove Goals' trademarks, including the Mark, and others were left intact showing the mark.  Others appeared to be patients under the influence of anesthesia, prepared for surgery, who did not provide waivers for Shokrian to take or publish photographs.

104.    Goals has copyrighted 9 of these photographs while others are subject to the intellectual property provisions and liquidated damages clauses in Exhibit B, Appendix C, Section 17.

105.    The copyrighted photographs are filed with the US Copyright Office and possess registration number VA 2-130-338.

106.    On December 8, 2018, Shokrian, through counsel, was advised of these violations and took some of them off of Instagram. However, as of January 2, 2019, they still remained on his Facebook page.

107.    Thereafter, Shokrian's conduct became more erratic and Goals became aware of more improper conduct of Shokrian.

108.    Similarly, Irina and EBC began posting Goals' copyrighted photographs on their Instagram pages falsely attributing the photographs and work to Shokrian while still retaining some of Goals' writings.

109.    Indeed, these photographs, as with the ones Shokrian infringed upon, are altered to remove Goals' trademarks and name thereby willfully intending to deceive.

110.    These photographs have been posted by Shokrian as recently as January 8, 2018 – long after he, and his counsel, were directly advised that these photographs are copyrighted and otherwise the intellectual property of Goals.

 I. **Shokrian's Other Improper and Violative Conduct**

111.    Shokrian still had surgeries scheduled for the coming week and was booked through

March of 2019.

112.    On December 10, 2018, Shokrian appeared at Goals with another man, upon information and belief Dr. Marc Everett, Shokrian's partner at Millennial, and tried to bring him into the surgery rooms to show him Goals' methods that Shokrian was taught by Goals' principal, Sergey Vokin, M.D. His access was denied.

113.    Thereafter, a patient advised Goals staff that Shokrian had given her his business card and told her to cancel her appointments at Goals and that he would perform the same surgery on her for less at his own clinic – thereby violating the terms of his Agreement.

114.    Goals, thereafter, learned that Shokrian did this to many patients, trying to contact them to go to his other center instead of Goals where he would obtain the entire fee for services rather than his payment per surgery of $1,000.00.

115.    Additionally, Goals is in the process of opening a new center in Brooklyn.

116.    Goals' construction workers advised that they were approached by Shokrian who asked them if they would build his surgical center for him and Millennial close to Goals' center in Harlem.

117.    Due to the lack of trust, Goals ceased offering any surgeries to Shokrian and reassigned any so far scheduled appointments to other doctors.

118.    Upset at this loss of a very lucrative income, Shokrian begged for Goals to reconsider.

119.    However, in the days and weeks that followed, Goals learned that Shokrian had also solicited additional services from Goals' patients while he was performing surgery on them and they were under the influence of medication and had them pay for these additional services to his own account and not Goals thereby unjustly enriching himself. One of these was on December

4, 2018!

120. On December 17, 2018, Farai posted on Instagram pictures of her meeting with Shokrian and Irina with the title "plastic surgery meetings."

121. At the same time, Irina posted that she was meeting with her long-time friend, Shokrian, and that they had exciting news that appeared to have been several months in the planning phase.

122. On December 17, 2018, Goals was in the process of having its annual inspection by the State and City Departments of Health.

123. Goals was advised by one of the inspectors that she had been contacted by Shokrian and asked whether it would be ok to perform surgery within an unlicensed salon – which was, clearly, rejected.

124. By the end of the day, EBC posted an Instagram post indicating that it was going to be performing the same surgery that Goals specialized in, Lipo360 and a BBB (liposuction of the entire abdominal area and injection of fat into the buttocks called a "Brazilian butt lift") for the same cost as Goals or less.

125. Patients of Goals advised that, in the following days, after they made posts on Goals' Instagram pages, they were contacted by Shokrian directly and he solicited them to obtain services at his own office.

126. At least one of the patients, believing that he was still at Goals, agreed and travelled to Goals for her surgery only to learn that Shokrian meant for her to have the surgery performed at a different location. She was very upset by his conduct.

127. Another patient advised that she too was contacted by Shokrian and made an appointment with him before learning that he was not with Goals. She chose not to go to his

appointment and Shokrian called her 10 times within a 20-minute span on December 11, 2018 after communicating with this potential patient of Goals via text message in the prior several days.

128.   At approximately this same time, and into the beginning of 2019, Shokrian, along with Isis by and through Surgery411, began posting innumerable false, defamatory and otherwise improper posts about Goals, its owner/principal and his spouse solely for the purpose of causing reputational and financial harm to Goals and its owner, principal and his spouse.

129.   On many of these defamatory posts, accusing Goals of having unsanitary conditions or committing criminal activity, Shokrian has posted "comments" saying that he has information and offering to have patients come to him.

130.   On December 29, 2018, unsolicited, Shokrian sent threatening texts to Goals' principal's wife which Goals construes as a threat to her safety – that he is going to cause her harm and bury her alive. Goals' principal's wife is now scared for her life that Shokrian may cause her physical harm since the termination of his agreement with Goals has resulted in him losing upwards of $20,000.00 or more in a given week (or, for context, over a Million Dollars per year in income).

131.   Further, pictures and videos appeared on Surgery411 which were illegally and surreptitiously taken within an area appurtenant to surgery rooms of Goals' patients in various states of dress without the permission of such patient or Goals and in violation of such patients' rights under HIPAA.

132.   Few would have had access to such area, one such individual being Shokrian who has already evidenced a thorough lack of compliance with patient privacy by taking pictures of patients without their consent and posting those photographs on his own social media pages while falsely attributing such treatments to himself and Millennial rather than to Goals.

133.    Upon information and belief, Shokrian, Irina and Farai had planned, since Farai's departure from Goals, to steal Goals' trade secrets, including patient lists and other information protected by HIPAA, and use Goals' intellectual property, including its trademarks and copyrights – both registered and common law – for their benefit at Goals' detriment.

134.    Upon information and belief, Shokrian, knowing about the animosity and litigation with Isis, contacted her and conspired with her to defame and otherwise cause harm to Goals, its principal and his family.

135.    At this same time, Chrismary had also started posting on Surgery411 and provided Surgery411 with confidential internal business records and documents, including confidential trade secret discussions, reduced as screenshots and uploaded onto Surgery411.

136.    Similarly, upon information and belief, Natasha improperly accessed Plaintiff's computer systems or Electronic Medical Records ("EMR") system or accessed other confidential discussions to which she was a party as a result of being the specific patient coordinator for such patient, and stole patient photographs – including one showing a patient who suffered a complication and who settled and released Goals from any claims she may have had. This photograph was posted on Surgery411.

137.    Chrismary, Isis, Natasha or another Defendant claimed that this was "hush money" to silence such individual – thereby defaming Plaintiff and alleging wrongful or potentially illegal conduct.

138.    Knowing that their conduct is improper, illegal, and defamatory, and in anticipation of their lawful takedown of their Instagram page – Surgery411 – Surgery411 and Isis create a backup page – Surgery411 Backup.

139.    Shortly thereafter, another former employee contacted Goals to advise that she was

being contacted by Natasha and trying to have this former employee contact other current employees to have them quit working for Goals and go with her, Natasha, and others, to work with Shokrian and Irina as Shokrian had solicited them to come work for him in violation of the terms of his contract with Goals.

140.    This discussion was defamatory and otherwise improper as well as a tortious interference.

141.    As discussed above, neither Irina nor ECB are licensed and are, therefore soliciting those former and current employees of Goals to work at an illegal clinic.

142.    Many other former employees of Goals have also been involved in the conspiracy with the other defendants to steal trade secrets, copyrights and to solicit patients of Goals and may be named later in an amended complaint.

143.    Thus, by virtue of the conduct of Defendants as set forth herein, Goals has been harmed and otherwise damaged and seeks remedies as permissible under the applicable laws and contractual obligations therein.

144.    Indeed, just the patients who have cancelled appointments as a result of the conduct of the Defendants, and upon information and belief, sought the same work from Shokrian outside of Goals, has been a loss to Goals in excess of $125,000.00 to date.

## COUNT ONE
## AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS
## AND SURGERY411
## (Federal Trademark Counterfeiting in Violation of Sections
## 32(1)(a) and (b) of the Lanham Act (15 U.S.C. § 1114))

145.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

146.    Sections 32(1)(a) and (b) of the Lanham Act, 15 U.S.C. § 1114(1)(a) and (b) set forth, in relevant parts, that any person who shall, without the consent of the registrant:

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be using in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

147.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411 have willfully used designations which are counterfeits of the registered GOALS trademarks on services for which Goals holds the federal trademark registration.

148.    Without the consent of Goals, Shokrian, Millennial, Irina, ECB, Isis and Surgery411 have applied the GOALS trademarks onto materials in connection with the sale, offering for sale, and distribution of services for their own personal financial gain.

149.    Goals has not authorized, at any time, Shokrian, Millennial, Irina, ECB, Isis and Surgery411 to use the GOALS trademarks to advertise, offer for sale, sell and/or distribute Shokrian, Millennial, Irina, ECB, Isis and Surgery411's services.

150.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411 unauthorized use of the GOALS trademarks on, or in connection, with the advertising and sale of services constitutes the use of Goals' registered marks in commerce.

151.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's unauthorized use of the GOALS trademarks is likely to cause confusion, mistake, or deception; cause the public to believe that Defendants Shokrian, Millennial, Irina, ECB, Isis and/or Surgery411 services are authorized,

sponsored or approved by Goals when they are not; and result in the Defendants Shokrian, Millennial, Irina, ECB, Isis and Surgery411 unfairly and illegally benefitting from Goals' goodwill.

152. Shokrian, Millennial, Irina, ECB, Isis and Surgery411's use of a logo which is Goals', in their unauthorized use of Goals' trademarks is likely to enhance the confusion as to the source, sponsorship, affiliation, or endorsement of the services offered by these defendants to believe that it originated from Goals.

153. Accordingly, the Defendants have engaged in trademark counterfeiting in violation of Sections 32(1)(a) and (b) of the Lanham Act, 15 U.S.C. § 1114(l)(a) and (b), and are liable to Goals for all damages related thereto, including but not limited to actual damages, infringing profits and/or statutory damages, as well as attorney's fees.

154. The Defendants, Shokrian, Millennial, Irina, ECB, Isis and Surgery411's, acts have caused, and will continue to cause, irreparable injury to Goals.

155. Goals has no adequate remedy at law and is thus entitled to damages in an amount yet to be determined.

156. The Defendants, Shokrian, Millennial, Irina, Isis, ECB, Isis and Surgery411's egregious conduct in repeatedly selling their services bearing the unauthorized GOALS trademarks is willful and intentional, and thus this constitutes an exceptional case especially as Shokrian, Irina and Isis were all aware of the importance of the GOALS trademarks in the industry.

157. As a result, Goals is entitled to damages in an amount to be determined at trial, but at least $1,000,000.00 plus an accounting of Defendants' books and records to determine the total remuneration gained and gathered from Defendants' conduct.

## COUNT TWO
## AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS

**AND SURGERY411**
**(Federal Trademark Infringement in Violation of Sections 32**
**of the Lanham Act (15 U.S.C. § 1114))**

158.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

159.    Sections 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), prohibits any person

using in commerce, without the consent of the registrant:

> *Any* reproduction, counterfeit, copy, or colorable imitation of a
> registered mark in connection with the sale, offering for sale,
> distribution, or advertising of any goods or services on or in
> connection with which such use is likely to cause confusion, or
> to cause mistake, or to deceive . . .

160.    The GOALS trademark is federally registered. The trademark is distinctive and is

associated in the mind of the public, with respect to the telemarketing industry, with Goals.

161.    Additionally, based upon Goals, and their associated entities by way of contract or

otherwise, extensive advertising, sales, and the popularity of the services bearing the GOALS

trademark, and Goals' extensive conduct in protecting said trademark, the mark GOALS, as it

relates to certain plastic or cosmetic surgery and related medical spa services, has acquired

secondary meaning so that the public, in the plastic and cosmetic surgery industry, associates the

trademark solely and exclusively with Goals.

162.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411, have utilized and are

utilizing counterfeit and/or unauthorized reproduction of the GOALS trademark in connection

with the advertising, sale and offering for sale of services for their own financial gain.

163.    Goals did not authorized Shokrian, Millennial, Irina, ECB, Isis or Surgery411 use

of the GOALS trademark.

164.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's unauthorized use of the

GOALS trademark on, or in connection with, the advertising and sale of services constitutes the

use of Goals' mark in commerce.

165. Shokrian, Millennial, Irina, ECB, Isis and Surgery411's unauthorized use of the GOALS trademark is likely to cause confusion, mistake, or deception; cause the public, in the plastic and cosmetic surgery industry, to believe that these Defendants' services emanate or originate from Goals when they do not, or that Goals has authorized, sponsored, approved or otherwise associated itself with these Defendants or their unauthorized services bearing the GOALS trademark.

166. Shokrian, Millennial, Irina, ECB, Isis and Surgery411's unauthorized use of the GOALS trademark has resulted in these defendants unfairly and illegally benefiting from Goals' goodwill. This has caused, and continues to cause, irreparable injury to the public in the plastic and cosmetic surgery industry, Goals, the GOALS trademark, and the substantial goodwill represented as a result.

167. Shokrian, Millennial, Irina, ECB, Isis and Surgery411's use of a logo which is so similar to Goals', in their unauthorized use of Goals' trademark is likely to enhance the confusion as to the source, sponsorship, affiliation, or endorsement of the services offered by these defendants to believe that it originated from Goals.

168. Therefore, Shokrian, Millennial, Irina, ECB, Isis and Surgery411 have engaged in trademark infringement in violation of 15 U.S.C. § 1114.

169. Shokrian, Millennial, Irina, ECB, Isis and Surgery411 acts have caused, and will continue to cause, irreparable injury to Goals.

170. Goals has no adequate remedy at law and is thus entitled to damages in an amount yet to be determined.

171. The Defendants, Shokrian, Millennial, Irina, ECB, Isis and Surgery411's

egregious conduct in repeatedly selling their services bearing the unauthorized GOALS trademark is willful and intentional, and thus this constitutes an exceptional case especially as Shokrian, Irina and Isis were all aware of the importance of the GOALS trademarks in the industry.

172.    As a result, Goals is entitled to damages in an amount to be determined at trial, but at least $1,000,000.00 plus an accounting of Defendants' books and records to determine the total remuneration gained and gathered from Defendants' conduct.

<div align="center">

**COUNT THREE**
**AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, EBC, ISIS**
**AND SURGERY411**
**(Violation of the Copyright Act of 1976)**

</div>

173.    Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

174.    As set forth above, Plaintiffs owns a valid copyright over the photographs which are subject to copyright protection, are original, copyrightable, and was not transferred, licensed, or otherwise permission granted to Shokrian, Millennial, Irina, ECB, Isis and/or Surgery411.

175.    Beginning in at least September of 2018, and continuing to date, the Defendants utilized and/or copied these copyrighted works, and modified them without permission notwithstanding that Plaintiffs have the sole and exclusive right to either modify or grant the right to do so, by placing them on their social media pages, and otherwise and use these modified/altered versions of Plaintiffs' copyrighted photographs for their own financial gain and advertisement.

176.    The utilization of Plaintiffs' copyrighted materials by Defendants, including the alternations of the photographs and dissemination thereof, has infringed on Plaintiffs' copyrights and, as a result, has harmed and damaged Plaintiffs.

177.    Further, the methods to which the copyrights were infringed evidence willful and

intentional conduct, especially as Shokrian blocked Plaintiffs' access to view his social media page to which he was posting these infringing photographs and images.

178.    Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff seeks damages against Defendants, jointly and severally, in the maximum amount permissible under 17 U.S.C. § 504, for $1,350,000.00 plus attorneys' fees and costs pursuant to 17 U.S.C. § 505 along with an order for an equitable accounting for a determination of income derived from such misappropriation and an award of such actual damages and profits as a result of the infringement.

<div align="center">

**COUNT FOUR**
**AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, EBC, ISIS**
**AND SURGERY411**
**(Contributory Copyright Infringement)**

</div>

179.    Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

180.    Even if Shokrian, Irina or Isis did not infringe upon Plaintiffs' copyrights personally, they are liable for contributory infringement of Plaintiffs' copyrights as they knew of the infringing activity and induced, caused, or materially contributed to the infringing conduct of others.

181.    Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff seeks damages against Defendants, jointly and severally, in the maximum amount permissible under 17 U.S.C. § 504, for $1,350,000.00 plus attorneys' fees and costs pursuant to 17 U.S.C. § 505 along with an order for an equitable accounting for a determination of income derived from such misappropriation and an award of such actual damages and profits as a result of the infringement.

**COUNT FIVE**
**AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, EBC, ISIS**
**AND SURGERY411**
**(Vicarious Liability for Copyright Infringement)**

182.     Plaintiff repeats and realleges the facts as set forth in the preceding paragraphs as if set forth in full herein.

183.     Shokrian, Irina or Isis did not infringe upon Plaintiffs' copyrights personally, they are liable for contributory infringement of Plaintiffs' copyrights as they knew of the infringing activity and induced, caused, or materially contributed to the infringing conduct of others and obtained an obvious and direct financial interest in the infringement.

184.     Therefore, as a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff seeks damages against Defendants, jointly and severally, in the maximum amount permissible under 17 U.S.C. § 504, for $1,350,000.00 plus attorneys' fees and costs pursuant to 17 U.S.C. § 505 along with an order for an equitable accounting for a determination of income derived from such misappropriation and an award of such actual damages and profits as a result of the infringement.

**COUNT SIX**
**AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS**
**AND SURGERY411**
**(Trade Dress Infringement and False Designation of Origin in**
**Violation of Section 43(a) of the Lanham Act**
**(15 U.S.C. § 1125(a))**

185.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

186.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), sets forth, in pertinent part, that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

> description of fact, or false or misleading representation of fact, which . . . (1)(a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

187.    By making unauthorized use, in interstate commerce, of the GOALS trademark, these defendants have used a "false designation of origin" that is likely to cause confusion, mistake or deception as to the affiliation or connection of these defendants to Goals and as to the origin, sponsorship, association or approval of these defendants' services by Goals, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

188.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent these defendants' services as those of Goals, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

189.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's wrongful acts will continue unless and until enjoined by this Court.

190.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's acts have caused and will continue to cause irreparable injury to Goals and Goals has no adequate remedy at law and is thus damaged in an amount yet to be determined.

191.    The Defendants, Shokrian, Millennial, Irina, ECB, Isis and Surgery411's egregious conduct in repeatedly selling their services bearing the unauthorized GOALS trademark is willful and intentional, and thus this constitutes an exceptional case especially as Shokrian, Irina and Isis were all aware of the importance of the GOALS trademarks in the industry.

192.     As a result, Goals is entitled to damages in an amount to be determined at trial, but at least $1,000,000.00 plus an accounting of Defendants' books and records to determine the total remuneration gained and gathered from Defendants' conduct.

**COUNT SEVEN**
**AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS**
**AND SURGERY411**
**(Federal Trademark Dilution in Violation of**
**Section 43(c) of the Lanham Act**
**(15 U.S.C. § 1125(c))**

193.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

194.     Section 43(c)(1) of the Lanham Act, 15 U.S.C. § 1125(c)(1), sets forth, in pertinent part, that:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

195.     GOALS is the exclusive owner of the GOALS trademark as it applies to plastic and cosmetic surgery and related services.

196.     The GOALS trademark is famous and distinctive within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

197.     The GOALS trademarks are distinctive in its industry and have been in use for an extended period of time, even prior to final registration thereof, and play a prominent role in Goals' marketing, advertising and the popularity of its services across many different media.

198.     The GOALS trademark was and is "famous and distinctive" within the meaning of Section 43(c) of the Lanham Act long before these defendants began using unauthorized

reproductions, counterfeits, copies and colorable imitations of the GOALS trademark for their unauthorized services.

199.    The GOALS trademark has gained widespread publicity and public recognition, especially in the plastic and cosmetic surgery industry, in New York and elsewhere.

200.    To enhance its rights, Goals, have pending approval, nearly complete, for the federal registration for the GOALS trademark for the purposes of plastic and cosmetic surgery and related services.

201.    These defendants' sale of services that use the GOALS trademark constitutes use in commerce thereof.

202.    Goals has not licensed or otherwise authorized the use of the GOALS trademark to these defendants.

203.    Consumers are being misled to purchase these defendants' services in the erroneous belief that these defendants are associated with, sponsored by, or affiliated with Goals, or that Goals is the source of the services advertised.

204.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's use of a logo which is so similar to Goals', in their unauthorized use of the GOALS trademark, is likely to enhance the confusion as to the source, sponsorship, affiliation, or endorsement of the services offered by these defendants to believe that it originated from Goals and/or that Goals is the source of those services.

205.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's use of the GOALS trademark dilutes and/or is likely to dilute the distinctive quality of the mark and to lessen the capacity of the mark to identify and distinguish Goals' services. These defendants' unlawful use of the GOALS trademark in connection with other inferior services is likely to tarnish those trademarks and cause blurring in the minds of consumer in the telemarketing industry between

Goals and these defendants, thereby lessening the value of the GOALS trademark as a unique identifier of Goals' services.

206.     Shokrian, Millennial, Irina, ECB, Isis and Surgery411's acts have caused, and will continue to cause irreparable injury to Goals and Goals has no adequate remedy at law and is thus damages in an amount yet to be determined.

## COUNT EIGHT
## AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS AND SURGERY411
### (Trademark Dilution in Violation of the New York General Business Law (N.Y. Gen. Bus. Law § 360-1))

207.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

208.     New York General Business Law, Section 360-1, sets forth that:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

209.     Goals is/will be the exclusive owner of the GOALS trademark as it applies to plastic and cosmetic surgery and related services.

210.     Through prominent and continuous use in commerce, including commerce within New York, and actions to protect it, the GOALS trademark has become, and continues to become, famous and distinctive.

211.     After the GOALS trademark became famous, and without the authorization from Goals, Shokrian, Millennial, Irina, ECB, Isis and Surgery411used unauthorized reproductions, counterfeits, copies and colorable imitations of the GOALS trademark.

212.     These defendants' unauthorized use of the GOALS trademark dilutes and/or is likely to dilute the distinctive quality of those marks and to lessen the capacity of such marks to

identify and distinguish Goals' services.

213.    These defendants' unlawful use of the GOALS trademark in connection with inferior services is likely to tarnish the trademark and cause blurring in the minds of the consumers, especially in the plastic and cosmetic surgery industry, between Goals and these defendants, thereby lessening the value of the GOALS trademark as a unique identifier for Goals' services.

214.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's use of a logo which is so similar to Goals' in their unauthorized use of AO's trademark is likely to enhance the confusion as to the source, sponsorship, affiliation, or endorsement of the services offered by these defendants to believe that it originated from Goals and thereby lessening the value of the GOALS trademark as a unique identifier for Goals' services.

215.    By the acts described above, these defendants have diluted, and are likely to dilute the distinctiveness of the GOALS application pending trademark and caused a likelihood of harm to Goals' reputation in violation of Section 360-1 of the New York General Business Law.

216.    Shokrian, Millennial, Irina, ECB, Isis and Surgery411's acts have caused, and will continue to cause irreparable injury to Goals and Goals has no adequate remedy at law and is thus damages in an amount yet to be determined.

**COUNT NINE**
**AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS**
**AND SURGERY411**
**(Deceptive Acts and Practices Unlawful Business Practices in**
**Violation of the New York General Business Law (N.Y. Gen.**
**Bus. Law §§ 349 and 350))**

217.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

218.    New York General Business Law, Section 349, sets forth, in pertinent part that: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

-32-

219.     Similarly, New York General Business Law, Section 350 states, in pertinent part, that: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

220.     Through the advertisement, distribution, offer to sell and sale of unauthorized services bearing the GOALS trademark common law graphic mark, these defendants have engaged in a consumer-oriented conduct that has affected the public interest of New York and has resulted in injuries to consumer in New York including, but not limited to, those seeking plastic or cosmetic surgery or related services.

221.     These defendants' deceptive acts or practices, as described herein, are materially misleading. Such acts or practices have deceived or have a tendency to deceive a material segment of the public, *to wit*, those seeking cosmetic or plastic surgery or related services, to which these defendants have directed their marketing activities, and Goals has been injured as a result.

222.     By the acts described above, these defendants have willfully engaged in deceptive acts or practices in the conduct of business and furnishing of services in violation of Section 349 and 350 of the New York General Business Law.

223.     These Defendants' acts have caused, and will continue to cause, irreparable injury to Goals and Goals has no adequate remedy at law and is thus damaged in an amount not yet determined.

## COUNT TEN
## AGAINST DEFENDANTS SHOKRIAN, MILLENNIAL, IRINA, ECB, ISIS AND SURGERY411
### (Trademark Infringement in Violation of New York Common Law)

224.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

225.     Goals owns all right, title and interest in and to the GOALS trademark as described above, including all common law rights to the GOALS trademark and logo representing the

trademark.

226.    The services sold and offered for sale by these defendants incorporate imitations of Goals' common law trademarks, the use thereof is unauthorized and likely to cause consumer confusion in the plastic and cosmetic surgery and related services industry.

227.    These Defendants' acts have caused, and will continue to cause, irreparable injury to Goals and Goals has no adequate remedy at law and is thus damaged in an amount not yet determined.

<div align="center">

**COUNT ELEVEN**
**AGAINST SHOKRIAN AND MILLENNIAL**
**(Breach of Contract)**

</div>

228.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

229.    Shokrian and Millennial entered into a binding contract with Goals whereby Shokrian would obtain significant remuneration from Goals to provide services to which Goals required additional surgeons in return for agreeing to be bound by certain terms and conditions.

230.    Among those conditions was the obligations related to the intellectual property of Goals, and a promise not to solicit or otherwise seek to obtain services from Goals' patients with the full understanding that Goals' patients and prospective patients were Goals' patients and not these Defendants.

231.    Defendants were represented by competent counsel who negotiated, on their behalf, the terms of the contract to which these Defendants entered into with Goals and was therefore fully aware of such restrictions.

232.    There was consideration, detriments, mutuality and a meeting of the minds, evidenced by the contract being negotiated by these Defendants' counsel.

233.    Notwithstanding, as discussed above, on numerous occasions, and continuing to

this day, these Defendants have breached the terms therein including, but not limited to, through the following conduct:

    a.  Misappropriation of Plaintiffs' intellectual property resulting in liquidated damages of $10,000.00 per violations;

    b.  Soliciting patients and prospective patients of Plaintiffs to either cancel appointments with Plaintiffs and obtain such services from these Defendants or not interfere and merely try to direct those services to themselves; and

    c.  While Goals' patients were under anesthesia, coercing them to obtain additional services from these Defendants and have such patient pay these defendants directly thus circumventing any income which should be Goals'.

234.    As a result of these Defendants' conduct, these Plaintiffs were harmed and otherwise damaged.

## COUNT ELEVEN
## AGAINST FARAI
### (Breach of Contract)

235.    Plaintiffs repeat and reallege the preceding paragraphs as set forth herein.

236.    As a condition of employment, Farai signed an agreement with Goals that included non-solicitation and non-competition terms.

237.    Similarly, it included intellectual property terms which required the return of intellectual property.

238.    There was consideration, detriments, mutuality and a meeting of the minds.

239.    Defendant Farai breached this agreement by, *inter alia*, working with Irina to compete with Goals, using and retaining Plaintiffs' intellectual property and refusing to return it to Goals as well as using it for her new employers' benefit, and contacting employees of Goals

and attempting to solicit such employees to leave Goals and work with her at her new employer, EBC and/or Irina.

240.  Consistent with the terms of the agreement, Goals is entitled to injunctive relief, damages, liquidated damages and legal fees and costs for such violations.

241.  Goals has been harmed by Farai's conduct and is entitled to such relief as set forth in the Contract.

**COUNT TWELVE**
**AGAINST CHRISMARY**
**(Breach of Contract)**

242.  Plaintiffs repeat and reallege the preceding paragraphs as set forth herein.

243.  As a condition of employment, Chrismary signed an agreement with Goals that included certain terms related to the protection of Goals trade secrets.

244.  There was consideration, detriments, mutuality and a meeting of the minds.

245.  Defendant Chrismary breached this agreement by, *inter alia*, stealing internal and confidential business records of Goals after termination and providing it to Isis and Surgery411 for the purpose of harassing and otherwise causing harm to Goals

246.  Consistent with the terms of the agreement, Goals is entitled to injunctive relief, damages, liquidated damages and legal fees and costs for such violations.

247.  Goals has been harmed by Chrismary's conduct and is entitled to such relief as set forth in the Contract.

**COUNT THIRTEEN**
**AGAINST NATASHA**
**(Breach of Contract)**

248.  Plaintiffs repeat and reallege the preceding paragraphs as set forth herein.

249.  As a condition of employment, Natasha signed an agreement with Goals that

included non-solicitation and non-competition terms.

250. There was consideration, detriments, mutuality and a meeting of the minds.

251. Defendant Natasha breached this agreement by, *inter alia*, communicating with other employees and former employees of Goals, seeking to have them terminate their employment with Goals and work with Shokrian and Irina as well as EBC.

252. Consistent with the terms of the agreement, Goals is entitled to injunctive relief, damages, liquidated damages and legal fees and costs for such violations.

253. Goals has been harmed by Natasha's conduct and is entitled to such relief as set forth in the Contract.

**COUNT FOURTEEN**
**AGAINST SHOKRIAN AND MILLENNIAL**
**(Conversion in Violation of New York Common Law)**

254. Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

255. As set forth above, Shokrian and Millennial agreed to provide services to Goals' patients for remuneration with the understanding that they were solely Goals' patients.

256. As set forth above, Shokrian, while patients were under anesthesia, coerced patients of Goals to obtain additional services but, rather than pay Goals, pay Shokrian and/or Millennial directly.

257. Without commenting on the ethics and professional conduct of Shokrian by acting in such a way, any remuneration from those patients should have been to Goals and not Shokrian.

258. Thus, Shokrian converted the property of Goals to himself and as a result, Goals has been harmed.

259. Goals is entitled to an equitable accounting of Shokrian and/or Millennial's books

to determine the income improperly obtained.

## COUNT FIFTEEN
## AGAINST ALL DEFENDANTS
### (Trade Libel in Violation of New York Common Law)

260.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

261.    As set forth above, and with a purpose to cause harm to Goals, Defendants conspired together, willfully or unwilfully, to publish false, misleading, and otherwise derogatory facts about Plaintiffs on social media.

262.    The type of material published by Defendants is of the kind which is calculated to prevent others from dealing with the Plaintiffs in their business.

263.    The conduct of Defendants was and is detrimental to Plaintiffs' business dealings and such detriments may be demonstrated by way of lost dealings, lost employees, and other detriments to the business dealings of Plaintiffs.

264.    Indeed, as a result of this conduct, Defendants have suffered losses well in excess of $100,000.00 and this amount continues to grow.

## COUNT SIXTEEN
## AGAINST DEFENDANT SHOKRIAN
### (Harassment in Violation of New York Common Law)

265.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

266.    After Shokrian and Plaintiffs separated due to Shokrian's conduct, Shokrian proceeded to use a text message to harass, alarm, annoy, torment, terrorize and otherwise cause harm to Plaintiffs.

267.    Shokrian's use of social media and electronic messaging systems to communicate with current and former employees to solicit them to leave Goals and provide him information is for the purpose to harass, alarm, annoy, torment, terrorize and otherwise cause harm to Plaintiffs.

268.    Shokrian's conduct as set forth herein has harassed, alarmed, annoyed, tormented, terrorized and caused harm to Plaintiffs.

269.    Shokrian will continue this conduct unless permanently enjoined from doing so.

270.    The conduct of Shokrian is extreme and done with reckless disregard for the harm which may result thereof.

271.    As harm has resulted, punitive damages are warranted.

**COUNT SEVENTEEN**
**AGAINST ALL DEFENDANTS**
**(Violations of the Defend Trade Secrets Act, 18 U.S.C. 1836, et**
**seq., and Conspiracy to Violate)**

272.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

273.    As set forth herein, Plaintiffs own and possess certain confidential and trade secret documents and information as alleged above that relate to their customer lists, processes, and records.

274.    Plaintiffs' confidential and trade secret documents and information relate to products and services used, sold, and ordered in, or intended to be used, sold and/or ordered in interstate and/or foreign commerce.

275.    Plaintiffs have taken reasonable steps to protect the secrecy of its confidential and trade secret documents and information, including the secrecy of the information alleged to have been misappropriated by the Defendants, *to wit* their client lists and other confidential information.

276.    Defendants have misappropriated the confidential information and trade secrets in the improper and unlawful manner as set forth herein and have refused and failed to return such information and have otherwise attempted to conceal their theft of such information.

277.    Defendants misappropriation of Plaintiffs' trade secrets caused, and will continue to cause, substantial injury including, but not limited to, actual damages, lost profits, harm to their

reputation, additional costs to protect, and diminution in value of the trade secrets.

278.     Defendants' misappropriation of Plaintiffs' trade secrets was intentional, knowing, willful, malicious, fraudulent and oppressive.

279.     As a result of Defendants' conduct, Plaintiffs have been harmed and damaged, and are entitled to damages as well as injunctive relief, counsel fees, punitive damages, and an equitable accounting of all of defendants' records to calculate the income derived from their misappropriation of Plaintiffs' trade secrets.

## COUNT EIGHTEEN
## AGAINST ALL DEFENDANTS
### (Misappropriation of Trade Secrets in Violation of the New York Common Law)

280.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

281.     As set forth herein, Plaintiffs own and possess certain confidential and trade secret documents and information as alleged above that relate to their customer lists and financial records.

282.     Plaintiffs' confidential and trade secret documents and information relate to products and services used, sold, and ordered in, or intended to be used, sold and/or ordered in interstate and/or foreign commerce.

283.     Plaintiffs have taken reasonable steps to protect the secrecy of its confidential and trade secret documents and information, including the secrecy of the information alleged to have been misappropriated by the Defendants, *to wit* their client lists.

284.     Defendants have misappropriated the confidential information and trade secrets in the improper and unlawful manner as set forth herein and have refused and failed to return such information and have otherwise attempted to conceal their theft of such information.

285.     Defendants misappropriation of Plaintiffs' trade secrets caused, and will continue to cause, substantial injury including, but not limited to, actual damages, lost profits, harm to their

reputation, additional costs to protect, and diminution in value of the trade secrets.

286.     Defendants' misappropriation of Plaintiffs' trade secrets was intentional, knowing, willful, malicious, fraudulent and oppressive.

287.     As a result of Defendants' conduct, Plaintiffs have been harmed and damaged, and are entitled to damages as well as injunctive relief, counsel fees, punitive damages, and an equitable accounting of all of defendants' records to calculate the income derived from their misappropriation of Plaintiffs' trade secrets.

## COUNT NINETEEN
## AGAINST ALL DEFENDANTS
### (Violations of the Racketeer Influenced and Corrupt Organizations Act)

288.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

289.     Consistent with the applicable standards, the Defendants constitute an "enterprise" as defined pursuant to 18 U.S.C. § 1961(4) that is involved in interstate and foreign commerce.

290.     As set forth herein, the Defendants, working together, have, since at least the end of 2018, colluded and otherwise conspired with each other, for the purpose of causing harm to Plaintiffs, to misappropriate Plaintiffs trade secrets, to commit fraud against Plaintiffs, as would be a violation of 18 U.S.C. §§ 1831 and 1832.

291.     The conduct of the Defendants was for the purpose of economic gain by the Defendants to the detriment of the Plaintiffs.

292.     The conduct of the defendants, in conspiring together to steal trade secrets, have cost Plaintiffs economic damages well in excess of $1,000,000.00 and such damages were not only foreseeable by the Defendants, but an intent of the Defendants.

293.     Similarly, Defendants, working together have, since at least the end of 2018, colluded and otherwise conspired with each other, for the purpose of causing harm to Plaintiffs, to

misappropriate and criminally infringing upon the copyrights of Plaintiffs, as would be a violation of 18 U.S.C. § 2319.

294.     The conduct of the Defendants was for the purpose of economic gain by the Defendants to the detriment of the Plaintiffs.

295.     The conduct of the defendants, in conspiring together to steal trade secrets, have cost Plaintiffs economic damages well in excess of $1,350,000.00 and such damages were not only foreseeable by the Defendants, but an intent of the Defendants.

296.     Pursuant to the civil provisions of RICO, Plaintiffs have been harmed, damaged, and are entitled to treble damages and costs of suit including attorneys' fees.

**COUNT TWENTY**
**AGAINST ALL DEFENDANTS**
**(Conspiracy to Defraud)**

297.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

298.     As set forth above, the Defendants, together, either intentionally or as unwitting co-conspirators, have conspired with one another to defraud the public for the purpose of causing harm to Plaintiffs.

299.     Such conduct has occurred through a concerted effort to post fraudulent, false, defamatory and otherwise improper information on social media in an effort to cause economic harm to Plaintiffs.

300.     As a result of the conduct of the Defendants, Plaintiffs have been harmed and damaged.

**COUNT TWENTY-ONE**
**AGAINST ALL DEFENDANTS**
**(Tortious Interference and Conspiracy to Tortuously Interfere)**

301.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

302.     As set forth above, the Defendants, individually and/or together, either intentionally or as unwitting co-conspirators, have conspired with one another to interfere with the contractual agreements that Plaintiffs have with both their patients and their employees to cause, or attempt to cause, such parties to cancel or otherwise breach their agreements with Plaintiffs to cause harm to Plaintiffs.

303.     Such conduct was malicious and with the intended purpose to cause the interference.

304.     Similarly, the interference was intentional and without justification.

305.     As a result of the conduct of the Defendants, Plaintiffs have been harmed and damaged.

### COUNT TWENTY-TWO
### AGAINST ALL DEFENDANTS
### (Defamation/Slander/Libel)

306.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

307.     As set forth above, each so far named defendant has defamed Plaintiffs, either verbally or in writing, for the malicious purpose of causing reputational and other harm to Plaintiffs and to cause financial or other damages to Plaintiffs

308.     As a result of the conduct of the Defendants, Plaintiffs have been harmed and damaged.

### COUNT TWENTY-TWO
### AGAINST ALL DEFENDANTS
### (Libel, *per se*)

309.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth in full herein.

310.     These defendants have, on social medial, written and falsely claimed that these Plaintiffs have violated the law, are criminals, or have acted in violation of their obligations and

duties imposed upon medical practices for the malicious purpose of causing reputational and financial harm.

311.    As a result of the conduct of the Defendants, Plaintiffs have been harmed and damaged.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor, and against the Defendants, jointly and severally as applicable, as follows:

A.  Enjoin, preliminarily and permanently, Defendants from:

    a.    Using any reproduction, counterfeit, copy or colorable imitation of the GOALS trademarks (as defined herein) for and in connection with any not authorized by Plaintiffs;

    b.    Engaging in any course of conduct likely to cause confusion, deception or mistake, or to injure Plaintiffs business reputation or dilute the distinctive quality of the GOALS trademark;

    c.    Using any false description or representation, including words or other symbols tending falsely to describe or represent Defendants' unauthorized service as being those of Goals, or sponsored by or associated with Goals, and from offering such goods into commerce;

    d.    Further infringing the Goals' trademark by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, displaying or otherwise disposing of any services not authorized by Goals that bear any simulation, reproduction, counterfeit, copy or colorable imitation of the GOALS trademark;

    e.    Using any simulation, reproduction, counterfeit, copy or colorable imitation

of the GOALS trademark in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized services in such fashion as to relate or connect, or tend to relate or connect, such services in any way to Goals, or to any services sold, manufactured, sponsored or approved by, or connected with Goals;

f.    Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which may or is likely to lead the trade or public, or individual members thereof, to believe that any services provided, distributed, or sold by the Defendants are in any manner associated or connected with Goals, or are sold, manufactured, licensed, sponsored, approved or authorized by Goals;

g.    Infringing the GOALS trademark, or Plaintiffs' rights therein, or using or exploiting the GOALS trademark, or diluting the GOALS trademark; and

h.    Effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in any Final Judgment or Order in this action;

i.    Soliciting employees, both current or former, of Plaintiffs to work for Defendants;

B.   Awarding actual damages, trebled, and an award of all profits that Defendants derived from using the Avatar trademark, trebled as provided by 15 U.S.C. § 1117;

C.   Awarding counsel fees and costs of suit as provided by 15 U.S.C. § 1117;

D.   Awarding statutory damages, pursuant to 15 U.S.C. § 1117 (c)(1) in the amount of Two Hundred Thousand Dollars ($200,000.00);

E.   Awarding statutory damages, pursuant to 15 U.S.C. § 1117 (c)(2) in the amount of Two

Million Dollars ($2,000,000.00) for willful use of the GOALS trademark;

F.  Awarding statutory damages in the amount of One Hundred Thousand Dollars ($100,000.00) pursuant to 15 U.S.C. § 1117 (d);

G.  Actual damages for the violations of N.Y. Gen. Bus. Law §§ 349 and 350.

H.  Compensatory damages;

I.  Liquidated damages as applicable pursuant to the corresponding contractual terms;

J.  Actual, nominal and punitive damages for the defamation/slander/libel claims;

K.  Enjoin Defendants from the actual and threatened continued misappropriation of Plaintiffs' trade secrets pursuant to 18 U.S.C. 1836(3)(A);

L.  Award actual damages for the misappropriation of trade secrets pursuant to 18 U.S.C. 1836(3)(B)(i)(I);

M.  Order Defendants to disgorge any and all benefits and income to which they obtained and were unjustly enriched by cause of their misappropriation of Plaintiffs Trade Secrets 18 U.S.C. 1836(3)(B)(i)(II);

N.  Order a royalty as per 18 U.S.C. 1836(3)(B)(ii)

O.  Award exemplary damages in the amount of twice the damages awarded for trade secret misappropriation pursuant to 18 U.S.C. 1836(3)(C);

P.  Award compensatory and punitive damages for common law trade secret violations;

Q.  Award treble damages, punitive damages, and counsel fees and costs for violations of RICO pursuant to 18 U.S.C. § 1964;

R.  Awarding statutory damages, pursuant to 17 U.S.C. § 504 for willful infringement in the amount of $1,350,000.00;

S.  Awarding an equitable accounting of Defendants' records;

T.  Awarding actual damages and profits from Defendants' infringement pursuant to 17 U.S.C. § 504;

U.  Awarding damages for all amounts wrongfully obtained by Defendants from their use and infringement of Plaintiff's copyrights, including any income derived therefrom;

V.  Awarding counsel fees and costs of suit as provided by 17 U.S.C. § 505;

W.  Award Punitive damages;

X.  Award counsel fees and costs of suit;

Y.  Award prejudgment and post-judgment interest; and

Z.  Any other such relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs hereby demand a jury trial on triable issues raised by this complaint.

Dated: January 8, 2019

Respectfully submitted,

/s/ Joshua M. Lurie
Joshua M. Lurie, Esq. (JL7272)
Lurie|Strupinsky, LLP
15 Warren Street,
Suite 36 Hackensack, New Jersey 07601
Ph. 201-518-9999
jmlurie@luriestrupinsky.com

U.  Awarding damages for all amounts wrongfully obtained by Defendants from their use and infringement of Plaintiff's copyrights, including any income derived therefrom;

V.  Awarding counsel fees and costs of suit as provided by 17 U.S.C. § 505;

W.  Award Punitive damages;

X.  Award counsel fees and costs of suit;

Y.  Award prejudgment and post-judgment interest; and

Z.  Any other such relief as the Court deems just and appropriate.

## **JURY TRIAL DEMAND**

Pursuant to <u>Fed.R.Civ.P.</u> 38(b), Plaintiffs hereby demand a jury trial on triable issues raised by this complaint.

Dated: January 8, 2019

<div style="margin-left:40%">

Respectfully submitted,

<u>/s/ Joshua M. Lurie</u>
Joshua M. Lurie, Esq. (JL7272)
Lurie|Strupinsky, LLP
15 Warren Street,
Suite 36 Hackensack, New Jersey 07601
Ph. 201-518-9999
jmlurie@luriestrupinsky.com

</div>

E
X
H
I
B
I
T

A

**EXHIBIT A**

## **OFFER OF EMPLOYMENT**

_____

_____

_____

_____

Dear:         _Faras Makoni_

       We are pleased to offer you a position as a _Videographer / Social Media Manager_ which will be a full-time position where you will be paid as set forth in Exhibit A attached hereto.

       This position is an "employment-at-will" position as defined under New York law and therefore, subject to the terms in the Terms and Conditions of Employment and Confidentiality Agreement to which you are being provided, and which by signing this offer below you acknowledge receipt thereof, you may be terminated by NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery  at any time and for any reason other than those reasons barred by New York or Federal law.  Similarly, you may terminate your employment with us at any time for any reason with two weeks' notice.

       Your duties as a _Videographer / Social Media Manager_ are set forth in the supplement to this offer. By signing below, you have you acknowledged receipt thereof.

       Further, by signing below, you acknowledge that you have received a copy of the Terms and Conditions of Employment by Goals and agree to be bound to them.

       If you have any questions, please contact                at

_____

       Welcome to Goals!

                                       Best regards,

                                      NYC Medical Practice, P.C.
                                      d/b/a Goals Aesthetics & Plastic Surgery

Agreed and Accepted:   _Faras Makoni_           _03/08/2018_
                          [NAME]                             Date

## Goals Aesthetics & Plastic Surgery
## Terms and Conditions of Employment

These are the Terms and Conditions related to your employment with Goals Aesthetics & Plastic Surgery. They do not constitute an employment agreement. They are being provided to _____, who is hereafter referred to as the "Employee" from NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery who is hereafter referred to as "Employer."

**This is not an employment agreement. Employee understands that this position is an "employment-at-will" position as defined under New York law and therefore, subject to the terms herein, Employee may be discharged by the Employer, or the Employee may terminate their employment for any reason other than those reasons barred by New York or Federal law or as set forth herein.**

**Further, nothing in these Terms and Conditions shall, in any way, restrict or impede the Employee from exercising his or her rights under Section 7 of the National Labor Relations Act or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order.**

11

## CONFIDENTIALITY, NONCOMPETITION AGREEMENT

**THIS AGREEMENT**, dated this ___ day of _____, by and between _____ ("Employee") and NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery ("Employer")

### RECITALS

WHEREAS, Employer has offered Employee employment on an employment-at-will basis for NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery; and

WHEREAS, Employee has agreed to accept employment on an employment-at-will basis for Employer; and

WHEREAS, Employer is a is a New York Corporation, organized under the laws of the State of New York, and owns and operates medical practices; and

WHEREAS, Employer exists in a highly competitive industry; and

WHEREAS, Employer's practice, by necessity, results in the access to protected, confidential and/or privileged information; and

WHEREAS, in providing Employee with employment, Employer must, necessarily, provide Employee with access to Employer's intellectual property and trade secrets along with protected health information; and

WHEREAS, in addition to desiring to hire Employee, Employer desires to protect its trade secrets and intellectual property from theft and/or misappropriation; and

NOW, THEREFORE, Employee and Employer, intending to be legally bound, and in consideration of the mutual promises and other good and valuable consideration contained herein, receipt and sufficiency of which are hereby acknowledged, agree as follows:

### I
### Consideration

It is hereby understood and agreed that, in return for complying with the terms and conditions of this Agreement, Employee agrees that its employment and payment of wages by Employer, as set forth in the offer of employment and Exhibit A attached hereto, and which terms are incorporated in herein, is consideration for agreeing to the terms herein.

### II
### Representations and Warranties by Employee to Employer

The Employee has represented and warranted to the Employer that the Employee: (i) is not subject to any written non-solicitation or noncompetition agreement affecting the Employee's

11

employment with the Employer (other than any prior agreement with the Employer); (ii) is not subject to any written confidentiality or nonuse/nondisclosure agreement affecting the Employee's employment with the Employer (other than any prior agreement with the Employer); and (iii) has brought to the Employer no trade secrets, confidential business information, documents, or other personal property of a prior employer.

If the Employee is subject to any of these restrictions above, Employee has disclosed them to Employer.

### III
### Noncompetition

a.    During the Employee's employment with the Employer, the Employee shall not, individually or jointly with others, directly or indirectly, whether for the Employee's own account or for that of any other person or entity, engage in or own or hold any ownership interest in any person or entity engaged in a plastic surgery medical clinic or medical spa, and the Employee shall not act as an officer, director, employee, partner, independent contractor, consultant, principal, agent, proprietor, or in any other capacity for, nor lend any assistance (financial or otherwise) or cooperation to any such person or entity.

b.    In addition, for a continuous period of one (1) year commencing on termination of the Employee's employment with the Employer, the Employee shall not, individually or jointly with others, directly or indirectly, whether for the Employee's own account or for that of any other person or entity, engage in or own or hold any ownership interest in any person or entity engaged in a plastic surgery medical clinic or medical spa the same as or substantially similar to that of any plastic surgery medical clinic or medical spa owned or operated by the Employer, or any of their affiliates, and that is located or intended to be located anywhere within the five boroughs which make the City of New York or a radius of five (5) miles of any a plastic surgery medical clinic or medical spa owned or operated by the Employer, and Employee shall not act as an officer, director, employee, partner, independent contractor, consultant, principal, agent, proprietor, or in any other capacity for, nor lend any assistance (financial or otherwise) or cooperation to, any such person, or entity.

d.    Notwithstanding subsections (a) or (b), it shall not be a violation of this Section for Employee to own a one percent (1%) or smaller interest in any corporation required to file periodic reports with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, or successor statute.

e.    The exclusive remedy for a violation of subsections (a) or (b) shall be an agreement to liquidated damages as set forth in IX(b) below except that such liquidated damages shall be agreed to be the amount of Twenty Five Thousand Dollars ($25,000.00) as it is agreed between the Parties that the Employee has obtained specialized knowledge and training while employed by Employer which is invaluable and could benefit any other competing surgical center or medical spa would benefit immensely to the detriment of Employer. However, the parties hereto understand that this irreparable injury to the Employer is such that a remedy at law may be inadequate and would be difficult to ascertain and, therefore,

11

liquidated damages are appropriate.

f.    Further, notwithstanding anything to the contrary, nothing herein shall bar the Employee from seeking or obtaining employment with any other competing surgical center or medical spa and providing social media services for them except as barred in section VII below.

## IV
## Nondisclosure, Non-solicitation and Non-piracy

Except in the performance of Employee's duties hereunder, at no time during the Term of Employment, or at any time thereafter, shall Employee, individually or jointly with others, for the benefit of Employee or any third party, publish, disclose, use, or authorize anyone else to publish, disclose, or use, any secret or confidential material or information relating to any aspect of the business or operations of the Employer, including, without limitation, any secret or confidential information relating to the business, customers, trade or industrial practices, trade secrets, technology, advertisement, marketing or know-how of any of the Employer or its affiliates. Moreover, during the Employee's employment with the Employer, and for one (1) year thereafter, Employee shall not offer employment to any employee of the Employer, or otherwise solicit or induce any employee of the Employer, to terminate their employment, nor shall Employee act as an officer, director, employee, partner, independent contractor, consultant, principal, agent, proprietor, owner or part owner, or in any other capacity, for any person or entity that solicits or otherwise induces any employee of the Employer to terminate their employment.

## V
## Employer or Company Property: Employee Duty to Return

All Employer products, product specifications, training materials, employee selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer/patient and vendor lists, prospectus reports, customer/patient or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products, now in the possession of Employee or acquired by Employee while in the employ of the Employer, shall be the exclusive property of the Employer and shall be returned to the Employer no later than the date of Employee's last day of work with the Employer.

## VI
## Intellectual Property - Inventions, Ideas, Processes, and Designs

All inventions, ideas, processes, programs, software, and designs, product specifications, training materials, employee selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer/patient and vendor lists, prospectus reports, customer/patient or vendor information, sales literature, territory

11

## XI
## Severability

Each section, subsection, and lesser Section of this Agreement constitutes a separate and distinct undertaking, covenant, or provision hereof. In the event that any provision of This Agreement shall be determined to be invalid or unenforceable, such provision shall be deemed modified to the minimum extent necessary to render the same valid and enforceable, and, in the event such a limiting construction is impossible, such invalid or unenforceable provision shall be deemed severed in its entirety from this Agreement. In the event of a modification or severing of a term as set forth herein, each and every other provision of this Agreement shall remain in full force and effect. Notwithstanding, **nothing herein shall be deemed to modify this Agreement to be an employment agreement. Employee understands that this position is an "employment-at-will" position as defined under New York law and therefore, subject to the terms herein, may be discharged by the Employer or the Employee may terminate their employment for any reason other than those reasons barred by New York or Federal law.**

## XII
## Waiver

The failure of the Employer to enforce any term, provision, or condition of This Agreement at any time or times shall not be deemed a waiver of that term, provision, or condition for the future, nor shall any specific waiver of a term, provision, or condition at one time be deemed a waiver of such term, provision, or condition for any future time or times.

## XIII
## Who is Bound

By accepting employment by signing the offer of employment and being provided a copy of this Agreement, you have agreed to be bound to this Agreement. Anyone who succeeds Employees rights, such as an heir or agent or otherwise, as also bound by this Agreement. Nothing herein shall be deemed to create an employment agreement or right to employment.

## XIV
## Modification

This Agreement may be modified, from time to time, by Employer with, or without, prior notice to Employee. Should any modification to this Agreement occur, Employer will provide Employee with a copy of the modification.

## XV
## Disputes, Choice of Laws, Jury Trials

This Agreement shall be construed and governed pursuant to the Laws of the State of New York. Any disputes arising related to this Agreement, whether related to construction or performance, shall be subject to the exclusive jurisdiction of the Supreme Court for Kings County, New York and to the exclusion of any and all other forums. This Agreement constitutes waiver

11

printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products (including all improvements): (i) conceived or made by Employee during the course of Employee's employment with the Employer (whether or not actually conceived during regular business hours) and for a period of six (6) months subsequent to the termination or expiration of such employment; and (ii) related to the business of the Employer, shall be disclosed in writing promptly to the Employer and shall be the sole and exclusive property of the Employer. An inventions, ideas, processes, programs, software, and designs, product specifications, training materials, employee selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer/patient and vendor lists, prospectus reports, customer/patient or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products (including an improvement) shall be deemed "related to the business of the Employer" if: (a) it was made with equipment, supplies, facilities, or confidential information of the Employer; (b) results from work performed by Employee for the Employer; or (c) pertains to the current business or demonstrably anticipated research or development work of the Employer.

Employee shall cooperate with the Employer and their attorneys in the preparation of patent, trademark and/or copyright applications for such developments and, upon request, shall promptly assign all inventions, ideas, processes, programs, software, and designs, product specifications, training materials, employee selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer/patient and vendor lists, prospectus reports, customer/patient or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products to the Employer. The decision to file for patent, trademark or copyright protection or to maintain such development as a trade secret shall be in the sole discretion of the Employer and Employee shall be bound by such decision.

If Employee provides the Employer with any inventions, ideas, processes, programs, software, and designs, product specifications, training materials, employee selection and testing materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer/patient and vendor lists, prospectus reports, customer/patient or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products if any, and such invention, idea, process, program, software, design, product specification, training material, employee selection and testing material, marketing and advertising material, special event, charitable and community activity material, customer correspondence, internal memoranda, products and design, sales information, project file, price list, customer/patient and vendor list, prospectus report, customer/patient or vendor information, sales literature, territory printout, call book, notebook, textbook, and all other like information or product, including all copies, duplications, replications, and derivatives of such information or product is used by the Employer, Employee agrees that such inventions, ideas, processes,

11

programs, software, and designs, product specifications, training materials, employee selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer/patient and vendor lists, prospectus reports, customer/patient or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products shall become the exclusive intellectual property of Employer.

<div align="center">

**VII**
**Trade Secrets**

</div>

Employee shall receive training from doctors, executives, trainers and/or senior employees of Employer with respect to their obligations and duties for the position Employee has been hired for and to perform the duties required of that position. Further, the training will include training and information concerning procedures and confidential proprietary methods Employer uses to obtain and retain business from their customer base, marketing and sales techniques, and information regarding the confidential information listed in above in this Agreement.

Employee understands and agrees that Employer may provide unique and specialized training and confidential information concerning Employer's business operations, including, but not limited to, processes and procedures, product specifications, medical practice or medical spa operating techniques and procedures, marketing techniques and procedures, financial data, processes, vendors and other information that was developed and maintained at considerable effort and expense to Employer, for the Employer's sole and exclusive use, and which if used by the Employer's competitors would give them an unfair business advantage. Specifically included herein are Employer's advertising and/or marketing campaign designs, methods and plans. Nothing herein shall bar Employee from, in the future, providing similar services to another employer except to the extent that such future employment shall not utilize Employer's advertising and/or marketing campaign designs, methods and plans.

Employee understands and agrees that it shall not provide any other medical practice, surgical center, plastic surgery center, medical spa, business, entity, person or other with any of the Employer's trade secrets as described herein without prior, written, authorization from Employer.

<div align="center">

**VIII**
**Reasonableness of Restrictions; Reformation; Enforcement**

</div>

The Employee recognizes and acknowledges that the geographical and time limitations contained in this Agreement are reasonable and properly required for the adequate protection of the Employer's interests. Employee acknowledges that the Employer will provide to Employee training in and confidential information in reliance on the covenants contained in this Agreement. Employee understands and agrees that if any portion of the restrictions contained in this Agreement are held to be illegal, unreasonable, arbitrary, or against public policy, then the restrictions shall be considered divisible, both as to the time and to the geographical area, with each month of the specified period being deemed a separate period of time and each radius mile of the restricted territory being deemed a separate geographical area, so that the lesser period of time or

<div align="center">11</div>

geographical area shall remain effective so long as the same is not illegal, unreasonable, arbitrary, or against public policy.

The Employee understands and agrees that, in the event any court of competent jurisdiction determines the specified period or the specified geographical area of the restricted territory to be illegal, unreasonable, arbitrary, or against public policy, a lesser time period or geographical area that is determined to be legal, reasonable, non-arbitrary, and not against public policy may be enforced against Employee.

## IX
## Violation of the Terms of Terms and Conditions of Employment by Employee

a.  Specific Performance, Right to Injunctive Relief

Employee agrees that a breach of any of the covenants contained in this Agreement will cause irreparable injury to the Employer for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Employer shall be entitled, in addition to any other rights and remedies they may have at law or in equity, to obtain an injunction to restrain Employee from any threatened or actual activities in violation of any such covenants.

Employee hereby consents and agrees that temporary and permanent injunctive relief may be granted in any proceedings that might be brought to enforce any such covenants without the necessity of proof of actual damages, and in the event the Employer does apply for such an injunction, Employee shall not raise as a defense thereto that the Employer has an adequate remedy at law.

b.  Liquidated Damages

In addition to the rights set forth in Section IX(a), Employee agrees that a breach of any of the covenants contained in this Agreement will cause irreparable injury to the Employer for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, except as set forth with specificity above, the Employer shall be entitled to liquidated damages as follows:

11

1. $100,000.00 for any intellectual property set forth in above which is misappropriated with respect to the diminished reputation or value of Employer in the community with respect to the misappropriated intellectual property; and

2. $10,000.00 for any other trade secret misappropriated.

Employee agrees that these amounts are reasonable in consideration of the harm which will befall the Employer for any misappropriation consistent with the agreement that actual damages may be impossible to otherwise quantify.

Nothing herein shall bar Employer from seeking any other remedies available at law.

c. Compensatory and Anticipatory Damages

Should a trade secret or other intellectual property be misappropriated by Employee, including, but not limited to, the use or sale of such intellectual property to a third-party, competing medical practice, surgical center, plastic surgery center or medical spa, or should Employee use any intellectual property as set forth in this Agreement for their own personal gain, Employee hereby agrees that it shall, upon demand, cease such misappropriation and, within thirty (30) days, forward all funds derived from such misappropriation to Employer along with certified financial statements showing the value or remuneration obtained from such misappropriation.   Should Employer be forced to initiate legal action, Employee agrees that, in addition to any other remedy available to Employer, including those remedies set forth in this Agreement, damages shall include the total amount of value, monetarily, obtained by Employee or anticipated to be obtained by Employee, as a result of such misappropriation.

d. Attorney's Fees and Costs

Should the Employer be forced to initiate any actions for a breach of this Agreement, and seek the relief under Sections III (c) or IX (a), (b) or (c), Employee hereby agrees that it shall pay the Employer's reasonable attorney's fees and costs related to any enforcement action in a court of competent jurisdiction to seek the relief herein including any and all appeals.  Employee agrees and understands that it shall not be entitled to its attorney's fees and costs if any action contemplated herein is unsuccessful by Employer unless required by court rule, law or statute. Further, Employee agrees and understands that it shall not be entitled to attorney's fees or costs for any action it brings against Employer unless required by court rule, law or statute.

## X
## Acknowledgments

Employee hereby acknowledges that the Employee has been provided with a copy of this Agreement for review prior to signing the acceptance of the offer of employment and that the Employee understands the purposes and effects of this Agreement.

11

of any arbitration, whether required pursuant to any law, statute, rule, regulation, or other principle in law or equity.

ALL PARTIES TO THIS AGREEMENT KNOW AND UNDERSTAND THAT THEY MAY HAVE A STATUTORY OR CONSTITUTIONAL RIGHT TO A JURY TRIAL. THE EMPLOYEE ACKNOWLEDGES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE OUT OF THIS AGREEMENT WILL INVOLVE COMPLICATED AND DIFFICULT FACTUAL AND LEGAL ISSUES.

EMPLOYER AND EMPLOYEE HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE EMPLOYEE AGREES THAT EITHER THEY OR THE EMPLOYER MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE IRREVOCABLE WAIVER OF A TRIAL BY JURY AND THAT ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

## XVI
### Additional Terms/Miscellaneous/HIPAA

a.      HIPAA and PHI. Employee understands that, as part of its employment with Employer, it will be exposed to, be required to handle, and will also be required to protect Protected Health Information ("PHI") and shall comply with all federal, state, and local laws and regulations pertaining to the confidentiality of medical records, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH") and the regulations promulgated thereunder by the United States Department of Health and Human Services. Employee shall immediately notify Employer of any "Breach" of "Protected Health Information" as the terms are defined by HIPAA and HITECH.

In furtherance of the obligation to protect such PHI, and to comply with the terms and conditions of the Employer regarding the possession and protection of such information, Employee shall receive HIPAA compliance training and shall sign such documents as necessary to evidence such training and obligations. A copy of such document shall be signed separate and apart and shall be kept in the Employee's file.

b.      Insurance Coverage. To the extent necessary, while employed by Employer, and provided that Employee maintains full-time status, Employer shall ensure that Employee is provided coverage under its malpractice insurance which shall be from a reputable company for services rendered hereunder with coverage limits consistent with limits provided to other similarly employed employees of Company.

Notwithstanding the foregoing, Company shall, at no time, be required to pay annual malpractice insurance premiums on behalf of Employee that are greater than twenty-five percent

11

(25%) more than the average individual premium for all full-time similarly situated, experienced and qualified employees of Employer (excluding Employee) if applicable.   In the event that coverage of any premium to provide coverage to Employee exceeds this limit, Employee shall be personally responsible for the payment of any and all additional amounts.

Employee is required to, and shall participate in any and all programs required, and pass all examinations given, by Employers' malpractice carrier.

c.      <u>Further Assurances</u>. Employee agrees to execute any and all such other documents and to take any and all such other action as may be reasonably necessary with respect to employment as Employer deems necessary in its sole and exclusive discretion including, but not limited to, any such documents related to legal or professional compliance, insurance, employment, payroll, or otherwise. Any such document to which Employer may require Employee to execute shall not be deemed to create a contractual right to employment.

**NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery**

2792 Ocean Avenue, Fl. 2             247-249 W. 135th Street             **T:** (833) 462-5769
Brooklyn, NY 11229                   New York, NY 10030                  **E:** hr@goalsplasticsurgery.com

# NON-SOLICITATION AGREEMENT

This Non-Solicitation Agreement is entered into on this __31st__ day of __January__ 20 _18_ , by and between NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery (the "Practice") and ___Farai Makoni___ (the "Workforce Member").

1. **Purpose.** The Parties wish to set forth the terms and conditions under which the Workforce Member may solicit the Practice's patients/clients, prospective patients/clients and Other Workforce Members.

2. **Consideration.** In consideration of the Workforce Member's execution of this Non-Solicitation Agreement, the Workforce Member will be entitled to employment, compensation and other benefits conferred onto the Workforce Member by the Practice. No separate monetary consideration shall be provided to the Workforce Member with respect to this Non-Solicitation Agreement and the general employment and receipt of compensation and benefits by the Workforce Member shall be deemed as good, valid, and sufficient consideration for this Non-Compete Agreement.

3. **Defined Terms.**

   a. **"Competitive Business"** refers to any medical office, doctor or practitioner, partnership, joint venture, corporation and/or any other entity and/or person and/or any licensee of such entity, that provides plastic surgery procedures, medical spa treatments, injectibles, and any other procedure or treatment that the Practice provides.

   b. **"Patient/Client"** refers to any person that has been subject to any medical or medical spa procedure or treatment from the Practice.

   c. **"Prospective Patient/Client"** refers to any person that is reasonably expected to subject themselves to any medical or medical spa procedure or treatment from the Practice.

   d. **"Other Workforce Members"** refers to any of the Practice's other administrative and professional employees, medical staff and other health care professionals; independent contractors; volunteers; agency, temporary and registry personnel; house staff, students, and interns.

   e. **"Protected Health Information ("PHI")"** refers to health information or patient/client information that the patient/client shares with a health care entity (i.e. the Practice). This includes, but is not limited to: information regarding a patient/client's medical history, mental, or physical condition or treatment, as well as the patient/client's family member records, test results, conversations, research records and financial information.

4. **Non-Solicitation of Patients/Clients and Prospective Patients/Clients.**

   a. The Workforce Member covenants and agrees that during the term of the Workforce Member's employment or association with the Practice and for two (2) years after any termination of such employment or association, the Workforce Member will not, directly or indirectly, solicit or attempt to solicit any business from any of the Practice's Patients/Clients or Prospective Patients/Clients on behalf of themselves or any Competitive Business.

   b. The non-solicitation restriction set forth in paragraph 4(a) is specifically limited to Patients/Clients and Prospective Patients/Clients of the Practice:

      i. With whom Workforce Member had contact with, whether personally, telephonically, or through written or electronic correspondence, during the three (3) year period immediately preceding the Workforce Member's termination; or

      ii. About whom Workforce Member had Protected Health Information.

5. **Non-Solicitation of the Practice's Workforce Members.** The Workforce Member covenants and agrees that during the term of the Workforce Member's employment or association with the Practice and for two (2) years after the termination of employment or association, the Workforce Member will not, directly or indirectly, on his or her behalf or on behalf of or in conjunction with

Workforce Member Non-Solicitation Ag~~reement~~ ~~Goals Aesthetics~~ & Plastic Surgery

any person or entity, recruit or solicit, or attempt to recruit or solicit, any of the Practice's Other Workforce Members with whom Workforce Member had personal contact or supervised throughout Workforce Member's association, or induce any Other Workforce Member to terminate their association relationship with the Practice.

6. **Injunctive Relief.** The parties agree that any breach of this Non-Solicitation Agreement by the Physician will result in irreparable injury to the Practice for which money damages are inadequate; therefore, in the event of a breach or an anticipatory breach, the Practice will be entitled (in addition to any other rights and remedies which it may have at law or in equity, including money damages) to have an injunction without bond issued enjoining and restraining the Workforce Member and/or any other person involved from breaching this Non-Solicitation Agreement.

The Practice will be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of any litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses.

7. **Integration.** This Non-Solicitation Agreement constitutes the entire understanding between the parties and supersedes all prior or contemporaneous understandings and agreements, whether oral or written, between the parties.

8. **Severability.** Although the restrictions contained in this Non-Solicitation Agreement are considered by the parties to be reasonable for protecting the business and good will of the Practice, if any such restriction is found by a court of competent jurisdiction to be unenforceable, such provision will be modified, rewritten or interpreted to include as much of its nature and scope as will render it enforceable. If it cannot be so modified, rewritten or interpreted to be enforceable in any respect, it will not be given effect, and the remainder of the Non-Solicitation Agreement will be enforced as if such provision was not included.

9. **Waiver.** Any failure by the Practice to enforce the Physician's strict performance of any provision of this Non-Solicitation Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Non-Solicitation Agreement.

10. **No Assignments.** This Non-Solicitation Agreement is personal in nature, and the Workforce Member may not directly or indirectly assign or transfer it by operation of law.

11. **Interpretation.** The headings in this Non-Solicitation Agreement are for organizational purposes only and should not be used in the interpretation or construction of this Non-Solicitation Agreement. The language in all parts of this Non-Solicitation Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Non-Solicitation Agreement.

12. **Jurisdiction and Venue.** The parties agree that the interpretation, legal effect and enforcement of this Agreement shall be governed by the laws of the State of New York and each party agrees to the jurisdiction of the courts of New York. The parties agree that any suit arising out of or relating to this Non-Solicitation Agreement shall be brought in Kings County, New York.

**WORKFORCE MEMBER ATTESTATION:**

- I HAVE READ AND UNDERSTOOD THE PRACTICE'S NON-SOLICITATION AGREEMENT AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY OF MY OWN CHOOSING.

- I UNDERSTAND AND AGREE THAT THE TERMS OF THIS NON-SOLICITATION AGREEMENT ARE REASONABLE AND NECESSARY TO PROTECT THE PRACTICE, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS.

- I UNDERSTAND THAT MY VIOLATION OF THIS AGREEMENT WILL RESULT IN IRREPARABLE HARM TO THE PRACTICE, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS AND CAN SUBJECT ME TO LITIGATION.

WORKFORCE MEMBER SIGNATURE | DATE

X **Farai Makoni** Digitally signed by Farai Makoni
Date: 2018.02.01 12:48:51 -05'00'

01/02/2018

# EMPLOYEE HANDBOOK RECEIPT ACKNOWLEDGMENT

### NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery

| | | |
|---|---|---|
| 2792 Ocean Avenue, Fl. 2 | 247-249 W. 135th Street | **T:** (833) 462-5769 |
| Brooklyn, NY 11229 | New York, NY 10030 | **E:** hr@goalsplasticsurgery.com |

| Employee Name | Date Handbook Received |
|---|---|
| Farai Makoni | January 31, 2018 |

As an employee of NYC Medical Practice, P.C. (the "Company") **I acknowledge that I received a copy of the Employee Handbook on the date written above and I have been given the opportunity to read it and understand it before signing this Acknowledgment.** I further understand that:

- The Handbook may reference "Allure Clinic", which is the previous name under which the Company operated. While the Company no longer operates under that name, all the Policies contained in the Handbook, as they may from time to time be revised, are applicable to all current employees of the Company.

- This Handbook contains information about very important Company policies, rules and regulations as well as information about critical employee benefits and my rights under various laws and regulations.

- **It is my responsibility to read and understand everything in the Handbook, if I have not done so already**.

- I have a responsibility to ask my supervisor or Company management questions if I do not understand or need clarification about something in this Handbook.

- **I am required to abide by and observe all the information and rules, policies and procedures explained in the Handbook, including future changes or additions. Furthermore, if I fail to abide by any of the rules, policies or procedures in this Handbook I may be subject to discipline, up to and including termination.**

- The company may change, rescind, or add to any policies, benefits, or practices described in the Handbook from time to time in its sole and absolute discretion, but that I will be notified in writing in advance of any such changes.

- **This Handbook is the property of the Company.** I may not share this Handbook with anybody that is not affiliated with the Company nor may I photocopy or otherwise reproduce this Handbook, in part or in full. Furthermore, **this Handbook must be returned to the Company when my employment with the Company ends.**

I further acknowledge that:

- I have thoroughly read and understood the Company's Technology Policies in Section 15 of the Handbook and agree to abide by established guidelines. I understand that the Company has the right to monitor all aspects of its computer, internet and phone system. **I understand that under these Policies I have no reasonable expectation of privacy while using technology at work.** This includes privacy in the Company computers, iPads, internet and telephone system as well as my personal computer, cell phone, iPad, or any similar device that I may bring to and use in the workplace.

- I have thoroughly read and understood the Company's Substance Abuse Policy in Section 12.19 of the Handbook. I further understand that the Company will not tolerate or condone substance abuse on Company property. I agree to abide by and observe all the information and rules, policies and procedures set forth in the Substance Abuse Policy. I also give the Company the right to inspect all Company areas as specified in the Substance Abuse Policy.

- I am an employee-at-will at the Company. This means that my employment at the Company will continue only if the Company and I both agree. I understand that the Company may terminate my employment for any reason whatsoever, with or without cause, and at any time and that I can resign at any time and for any reason. I further acknowledge that no section of the Handbook is meant to be construed, nor should be construed as establishing anything other than an employment-at-will relationship, nor does it limit management's discretion to make personnel decisions. The only way to alter my employment-at-will relationship is through a writing signed by an authorized representative of the Company and myself.

EMPLOYEE SIGNATURE: **Farai Makoni**   Digitally signed by Farai Makoni
Date: 2018.02.01 12:49:12 -05'00'   DATE: **01/02/2018**

# BIOMETRIC CLOCK – EMPLOYEE CONSENT FORM

### NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery

2792 Ocean Avenue, Fl. 2
Brooklyn, NY 11229

247-249 W. 135th Street
New York, NY 10030

**T:** (833) 462-5769
**E:** hr@goalsplasticsurgery.com

| Employee Name | Last 4 Digits of SSN | Time Clock Number |
|---|---|---|
| Farai Makoni | | 056 |

The Employee named above understands that NYC Medical Practice, P.C. (the "Company") utilizes biometric technology for the purpose of identification and recording time entries when utilizing the Company's time clock (a biometric time clock).

Biometric time clocks are generally computer-based systems that first capture some form of biometric data. The computer system then extracts unique data points (i.e. measures the distance between fingerprint whirls and ridges) and formulates a biometric template used to verify an employee's identity.

The Employee understands that he or she is free to decline to provide biometric data and may instead use the Time Clock Number above for timekeeping purposes. Declining to give such consent will not result in any adverse employment action against the Employee. Furthermore, the Employee may discontinue this consent by notifying the Company in writing.

The undersigned Employee voluntarily consents to providing biometric data for the purpose of identification and recording time entries when utilizing the Company's time clock.

EMPLOYEE SIGNATURE: _____ DATE: 02/02/2018

## NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery

| | | |
|---|---|---|
| 2792 Ocean Avenue, Fl. 2 | 247-249 W. 135th Street | **T:** (833) 462-5769 |
| Brooklyn, NY 11229 | New York, NY 10030 | **E:** hr@goalsplasticsurgery.com |

# HIPAA CONFIDENTIALITY AGREEMENT & TRAINING ATTESTATION

*This HIPAA Confidentiality Agreement applies to all NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery ("Goals")* **Workforce Members,** *including: employees, independent contractors, medical staff and other health care professionals; volunteers; agency, temporary and registry personnel; and house staff, students, and interns.*

### HIPAA PROTOCOL AND PROCEDURES FOR ALL GOALS WORKFORCE MEMBERS

Goals is committed to maintaining the strictest privacy and confidentiality standards in the use and handling of any and all medical information we have access to.

The Privacy Rule of the Health Insurance Portability and Accountability Act ("**HIPAA**") governs the use and release of patient identifiable information by health care providers. The Office of Civil Rights is charged with the responsibility for the Privacy Rule part of the law.

Because information is so readily available by e-mail, fax, internet, electronic records it can easily be obtained by people that do not need tom know the information and could potentially misuse the information. HIPAA's privacy rule addresses the following:

1. Greater restrictions for the use and disclosure of personal health information.

2. Patients have more access to and control and protection of their health information.

3. Establishes appropriate safeguards that healthcare providers must achieve to protect the privacy of health information.

4. Holds violators accountable with criminal and civil penalties that can be imposed if they violate patient's privacy rights.

5. Balances public responsibility to disclose some forms of data to protect public health.

All Workforce Members of Goals are considered "covered" entities, that is, a people or organizations that have access to protected health information and share that information electronically. As such, **every Workforce Member, including Employee, is required to follow the HIPAA Privacy Rule.**

### PROTECTED HEALTH INFORMATION (PHI)

All Workforce Members are required to know what information is covered under the rule and the types of information they are legally able to access and use. Commonly referred to as *individually identifiable health information* and *protected health information* or simply, **PHI**, both phrases are essentially the same and refer to health information or patient/client information that the patient/client shares with a health care entity (i.e.: Goals). This includes, but is not limited to: information regarding a patient/client's medical history, mental, or physical condition or treatment, as well as the patient/client's family member records, test results, conversations, research records and financial information.

Some information may not be considered PHI alone, but with other information it may be like pieces to a puzzle that could lead to the identification of patient/client. For example, a zip code is not normally a piece of information that can identify a patient, but together with an insurance card and a telephone number, it is possible to identify that person as a patient. If the information can reasonably be connected to the person's identity, then it is considered PHI in that instance.

**All health information that identifies an individual is considered PHI.** It does not matter if Goals is responsible for creating the information or if it receives it from another source such as a hospital, insurance company or other healthcare office. Under the HIPAA law, it is treated the same, as confidential information. **PHI can be oral, written or electronic**

**information.** A simple conversation between the doctor and the nurse about a patient/client and the diagnosis is considered the same as written information or electronically communicated PHI.

Examples of PHI include, but are not limited to:

- Physical medical and psychiatric records including: electronic, paper, photo, video, diagnostic and therapeutic reports, laboratory and pathology samples
- Patient insurance and billing records
- Computerized patient data
- Visual observation of patients receiving medical care or accessing services
- Verbal information provided by or about a patient
- Personal information such as: name, address, telephone number, e-mail and social security

## RULES FOR THE USE AND DISCLOSURE OF PHI

To **use** PHI means to access, view, examine, analyze and share information. To **disclose** PHI means to release to, transfer to and or make information available to someone who is not a Goals Workforce Member or to an Allure Workforce Member that is not authorized to receive such PHI.

Workforce Members may only use and disclose PHI for the following purposes:

1. Generally, for treatment, payment processing, and healthcare operations purposes. The law deems it appropriate for Workforce Members to access and use certain information to complete certain job responsibilities, accordingly, the patient/client does not need to provide written authorization to use and disclose such PHI.

2. If the patient/client or authorized individuals authorizes such use and disclosure in writing.

3. If the patient/client or authorized individual demands that such PHI be disclosed to the patient/client or authorized individual.

## ROUTINE AND NON-ROUTINE REQUESTS NOT RELATED TO TREATMENT

If information is directly related to the job responsibilities that each Workforce Member must do, generally it can be disclosed. If the information is not within that Workforce Member's job responsibility, then they must go to the designated person responsible for requests and disclosures at Goals and advise that individual of that request.

## GUIDELINES TO PROTECT THE PRIVACY OF HEALTH INFORMATION - HOW TO PROTECT PATIENT PRIVACY

1. All Workforce Members are required to keep patient records in a designated area, away from any place that is accessible to unauthorized individuals or casual viewers.

2. All Workforce Members must refrain from discussing any and all patient information in any public places, and make sure all formal and informational patient consultations are held in areas that have limited access to unauthorized individuals.

3. All Workforce Members must remember to log off computer terminals so that confidential information cannot be viewed by on lookers.

4. All Workforce Members must refrain from leaving papers around; all paperwork should be filed immediately upon creation or receipt, as appropriate.

5. All Workforce Members should utilize designated fax or copier machines for faxing or copying patient information. If no machine is specifically designated, fax or copy information in an area that has limited or no access to unauthorized individuals.

## PRIVACY OFFICER

HIPAA requires each organization that uses PHI to appoint a Privacy Officer to facilitate the implementation of these privacy rules. The Privacy Officer may designate a person to be responsible for implementing and maintaining most of these processes and the Privacy Officer retains oversight and responsibility for the entire program. It is every Workforce Member's responsibility to know the name and contact number of the designated individuals that have been assigned responsibility for complaints and other requests related to patient privacy. The **Privacy Officer** for Goals is: **VICTORIA SMOLYAR**

## NOTICE OF PRIVACY PRACTICES

Goals has a privacy practice designated to protect the privacy and confidentiality of patient protected health information. The Federal Government requires that each organization provides each patient a "Notice of Privacy Practice". This is developed by the organization that defines policies as to how the organization may use and disclose patient personal health information. Privacy notices are distributed to patients only once and usually upon admission and upon request to any member of the public. Copies of the receipt for the Notice of Privacy Practices will be kept on file for a period of 6 years. Notice of Privacy Practice is given at the first time of the patient encounter. Parents have access to the files of their children under the age of 18.

## PATIENT PRIVACY RIGHTS

The patient also has the following rights regarding the use and disclosure of his or her protected health information without fear of retaliation. In addition, patients cannot be asked to waive their rights as a condition of treatment and payment.

1. A patient has the right to receive the Privacy Notice at the time of first service.

2. A patient has the right to request restrictions or limitations on how their protected health information is used or disclosed for treatment, payment or healthcare operations.

   Any restriction request must be forwarded to the privacy officer.

3. Health care organizations will choose a method of identifying a record containing restricted information. A notation is made in the patient's medical record indicating that restrictions to the use and/or disclosure of protected health information is in force. For example, a brightly colored sticker can be used to indicate there are restrictions contained in the medical record.

4. The patient has the right to identify alternative means of communication and alternative locations that they wish to have their protected health information communicated for the purpose of maintaining confidentiality. This alternative method is different than the usual practice that the facility would use. This can include but not be limited to sending bills to a PO BOX as opposed to a home address, sending medical information via certified, not regular mail etc.

5. The patient has the right to request access to their health information for inspection and/or copying. This request is made in writing. Additionally, the patient may request to amend or change his or her health information by requesting to do so in writing.

6. The patient has the right to request in writing, an accounting of disclosures of health care information other than treatment, payment or health care operations.

## CONSEQUENCES FOR BREAKING THE RULES

There are penalties for anyone that intentionally violates the HIPAA Privacy Rule. **All Workforce Members are subject to possible penalties by the Office of Civil Rights, including civil and criminal penalties.** Criminal penalties can include rather hefty monetary penalties and or jail time. Examples of criminal actions include knowingly releasing information in violation of the law or selling the information.

Furthermore, **any Goals Workforce Member that intentionally violates the HIPAA Privacy Rule will be subject to immediate termination** from Goals.

**Goals has a zero-tolerance policy for Workforce Members that turn a blind eye to other Workforce Member's willful violations of the HIPAA Privacy Rule.** Any Workforce Member that sees another Workforce Member violate these rules, whether such violation is accidental or on purpose, must report the violation to the Privacy Officer. **Knowing and failing to report such willful violations will deem that Workforce Member complicit and will result in immediate termination.**

## DOCUMENTATION OF WORKFORCE HIPAA PRIVACY TRAINING

HIPAA requires that Goals' Privacy Officer train all Workforce Members on Goals' health information privacy policies and procedures to the HIPAA Omnibus Standards of 2013, which also includes HI-TECH and Protected Health Information (PHI), Electronic Protected Health Information (ePHI) and Electronic Health Records (EHR).

All Workforce Members with treatment, payment or healthcare operations responsibilities, which allow access to PHI, are trained with updates periodically as State and Federal mandates require. HIPAA also requires that Goals keep this documentation (that the training was completed) for six (6) years after the training.

I, Farai Martiana Makoni _____, **HAVE READ AND UNDERSTOOD GOALS' POLICY REGARDING THE HIPAA PRIVACY RULE AND THE PRIVACY, SECURITY, USE AND RELEASE OF PHI.**

**I AGREE TO MAINTAIN CONFIDENTIALITY OF ALL INFORMATION OBTAINED DURING MY EMPLOYMENT/AFFILIATION WITH GOALS, INCLUDING, BUT NOT LIMITED TO PERSONAL AND SENSITIVE INFORMATION REGARDING PATIENTS.**

**I UNDERSTAND THAT INAPPROPRIATE USE OR RELEASE OF PATIENT INFORMATION IS GROUNDS FOR IMMEDIATE TERMINATION AND THAT ANY SUCH INAPPRORIATE USE OR RELEASE OF PHI WILL BE REPORTED AND SUBJECT ME TO POSSIBLE PENALTIES FROM THE OFFICE OF CIVIL RIGHTS, INCLUDING CIVIL AND CRIMINAL PENALTIES, SUCH AS JAIL TIME AND FINES.**

**WORKFORCE MEMBER SIGNATURE**                                    **DATE**

X **Farai Makoni**  Digitally signed by Farai Makoni
Date: 2018.02.01 12:47:53 -05'00'                01/02/2018

## NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery

| | | |
|---|---|---|
| 2792 Ocean Avenue, Fl. 2 | 247-249 W. 135th Street | **T:** (833) 462-5769 |
| Brooklyn, NY 11229 | New York, NY 10030 | **E:** hr@goalsplasticsurgery.com |

# CONFIDENTIALITY, INTELLECTUAL PROPERTY & TRADE SECRETS AGREEMENT

*This Confidentiality, Intellectual Property & Trade Secrets Agreement applies to all NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery* **Workforce Members**, *including: employees, independent contractors, medical staff and other health care professionals; volunteers; agency, temporary and registry personnel; and house staff, students, and interns.*

This Confidentiality, Intellectual Property & Trade Secrets Agreement (the "Confidentiality Agreement") is entered into on this _31st_ day of _January_____, 20_18_, by and between NYC Medical Practice, P.C. d/b/a Goals Aesthetics & Plastic Surgery (the "Practice") and ___Farai Makoni_____ (the "Workforce Member").

1. **Purpose.** The Parties wish to set forth the terms and conditions under which information created or received by or on behalf of the Practice, including Confidential Information and Protected Health Information ("PHI") (both as defined below), may be used or disclosed by the Workforce Member under this Confidentiality Agreement, state law and the Health Insurance Portability and Accountability Act of 1996 and the HIPAA Omnibus Rule of 2013 (collectively, "HIPAA").

2. **Consideration.** In consideration of the Workforce Member's execution of this Confidentiality Agreement, the Workforce Member will be entitled to employment, compensation and other benefits conferred onto the Workforce Member by the Practice. No separate monetary consideration shall be provided to the Workforce Member with respect to this Confidentiality Agreement and the general employment and receipt of compensation and benefits by the Workforce Member shall be deemed as good, valid, and sufficient consideration for this Confidentiality Agreement.

3. **Confidential Information.** Both Parties to this Confidentiality Agreement, as defined in this Agreement, acknowledge that, in providing the services as set forth in the Agreement, and subject to the terms and conditions therein, may or will necessitate disclosure of Confidential Information by the Practice to the Workforce Member and the use of Confidential Information by the Workforce Member.

   A. Definitions.

   "*Protected Health Information*" ("PHI") refers to health information or patient/client information that the patient/client shares with a health care entity (i.e. the Practice). This includes, but is not limited to: information regarding a patient/client's medical history, mental, or physical condition or treatment, as well as the patient/client's family member records, test results, conversations, research records and financial information. All health information that identifies an individual is considered PHI. It does not matter if Goals is responsible for creating the information or if it receives it from another source such as a hospital, insurance company or other healthcare office. Under the HIPAA law, it is treated the same, as confidential information. PHI can be oral, written or electronic information. A simple conversation between the doctor and the nurse about a patient/client and the diagnosis is considered the same as written information or electronically communicated PHI.

   "*Confidential Information*" shall include all information or material that has or could have commercial value or other utility in the business in which the Practice is primarily engaged including, but not limited to, any trade secrets as defined below, or any intellectual property of the Practice. If Confidential Information is in written form, the Practice shall label or denote the materials with the word "Confidential" or some similar warning. If Confidential Information is transmitted orally, except PHI, the Practice shall promptly provide a writing indicating that such oral communication constituted Confidential Information if necessary.

   In addition, Confidential Information shall also include the following non-exhaustive list:

   * PHI;

- Any information about patients of the Practice or employees of the Practice, including, but not limited to, employee names, addresses, telephone numbers, e-mails, social media accounts, spouse or children information, and/or social security information or numbers;

- Any computer owned, used or maintained by the Practice, including any, e-mail, program, database or website log-on information or passwords thereto;

- Any patient records or billing information;

- Any patient lists;

- Any financial information about the Practice or its patients that is not publicly available information;

- Any intellectual property rights of the Practice as defined and discussed hereinbelow;

- Any proprietary information or trade secrets of the Practice as set forth and discussed hereinbelow;

- Any information that concerns the Practice's contractual relationships, relates to the Practice's competitive advantages, or is otherwise designated as confidential by this Practice as set forth and discussed herein below;

- Any information obtained from the Practice's records which if disclosed, would constitute an unwarranted invasion of privacy; and

- Any confidential business information that would cause harm to the Practice if disclosed.

B.  Exclusions from Confidential Information. Workforce Member's obligations under this Confidentiality Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Workforce Member; (b) discovered or created by Workforce Member before disclosure by the Practice; (c) learned by the Workforce Member through legitimate means other than from the Practice or the Practice's representatives; or (d) is disclosed by the Workforce Member's with the Practice's prior written approval of such information provided to the Workforce Member from the Practice and specifically denoted as to be forwarded or disclosed to potential third-parties to which the Practice has granted to the Workforce Member in writing.

C.  Obligations of the Workforce Member. The Workforce Member shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Practice. Workforce Member shall carefully restrict access to Confidential Information to other employees, contractors, and third parties as is reasonably required and shall require those persons to sign non-disclosure restrictions at least as protective as those in this Confidentiality Agreement if necessary.

Workforce Member shall not, without prior written approval of the Practice, use for Workforce Member's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of the Practice, any Confidential Information.

The Workforce Member shall return to the Practice any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if the Practice requests it in writing and/or consistent with the terms herein.

D.  Time Period for Maintenance of Confidence. The non-disclosure provisions herein shall survive after the termination of this Agreement and Workforce Member's duty to maintain and hold such Confidential Information in confidence shall remain in effect until the Practice ceases operations, or until the Practice sends Workforce Member written notice releasing Workforce Member from this Confidentiality Agreement, or after ten (10) years elapsed from the termination of the Agreement, whichever occurs first.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to bar the disclosure of any such confidential information:

i.    Upon the written consent of all Parties;

ii.  In response to an order of a court of competent jurisdiction following reasonable notice (not fewer than two (2) business days) to the Parties in accordance with the notice provisions set forth in the Agreement;

iii.  In response to any inquiry or order issued by a state or federal agency of competent jurisdiction provided that the receiving Party gives reasonable notice (not fewer than two (2) business days) to the other Party in accordance with the notice provisions set forth in the Agreement;

iv.  To the extent necessary, to appropriate taxing authorities;

v.  To any Party's accountants, attorneys, financial advisors, and/or tax advisors and then only upon the agreement of the above-referenced third-parties to maintain the confidentiality of the Confidential Information; or

vi.  In connection with the enforcement of this Agreement.

For purposes of this section, the term "an order of a court of competent jurisdiction" shall not mean a deposition notice or demands for discovery or a subpoena.

4.  **Trade Secrets.** By way of entering into this Agreement, Workforce Member may receive or otherwise become privy to unique, specialized, and/or Confidential Information concerning the Practice's business operations, including, but not limited to, operating techniques and procedures, marketing techniques and procedures, financial data, processes, vendors and other information that was developed and maintained at considerable effort and expense to the Practice, for the Practice's sole and exclusive use, and which if used by the Practice's competitors, would give those competitors an unfair business advantage.

Workforce Member understands and agrees that it shall not provide any other business, medical practice, entity, person or other with any of Practice's trade secrets as described herein without prior written authorization from the Practice.

5.  **Intellectual Property – Inventions, Ideas, Processes, and Designs.** All inventions, ideas, processes, and designs (including all improvements): (i) conceived or made by the Workforce Member (or any agent of Workforce Member) during the Workforce Member's employment or affiliation with the Practice (whether or not actually conceived during regular business hours); and (ii) related to the business of the Practice, shall be deemed a work for hire and become the property of the Practice.

For the purpose of this section, an invention, idea, process or design (including an improvement) shall be deemed "related to the business of the Practice" if: (a) it was made with equipment, supplies, facilities, or Confidential Information of the Practice; (b) results from work performed by Workforce Member; or (c) pertains to the current business or demonstrably anticipated research or development work of the Practice.

Notwithstanding anything to the contrary, if Workforce Member, during the Workforce Member's employment or affiliation with the Practice, suggests, assists, works on, or otherwise modifies any process or any existing intellectual property of the Practice to which the Practice has a trademark, patent or copyright, either statutorily or under common law; any suggestions, changes, edits, modification, amendments, designs, versions or updates to such trademarked, patented or copyrighted intellectual property of the Practice shall remain the sole and exclusive property of the Practice and Workforce Member shall, upon the request of the Practice, provide in writing a waiver of any potential rights thereto.

The Workforce Member and any agent of Workforce Member shall cooperate with the Practice, or any such individual or entity as Practice assigns said intellectual property, and their attorneys, in the preparation of patent, trademark and copyright applications for such developments and, upon request, shall promptly assign all such inventions, ideas, processes, and designs to the Practice as set forth in this section. The decision to file for patent, trademark or copyright protection, or to maintain such development as a trade secret, shall be in the sole and exclusive discretion of the Practice and Workforce Member shall be bound by such decision.

6.  **Intellectual Property – Photographs and Videos.** Notwithstanding anything to the contrary, all photographs and videos taken by the Workforce Member during the Workforce Member's employment or affiliation with the Practice, shall remain the intellectual property of the Practice and are subject to all the applicable provisions of this Confidentiality Agreement, including, but not limited to, all the Types of Disclosure, Non-Disclosure, Indirect Disclosure and Violations, as set forth below.

7. **Types of Disclosure and Use.** Workforce Member understands and agrees that the disclosure and use of Confidential Information includes oral communications as well as display, reproduction or distribution of tangible physical documentation, in whole or in part, from any source or in any format (e.g., paper, digital, electronic, internet, social network postings on platforms such as Facebook, Twitter, Instagram, Snapchat, etc., magnetic or optical media, film, etc.).

8. **Ownership of Confidential Information.** Workforce Member understands and agrees that the Practice, not the Workforce Member, is the owner under state and/or federal law and the Workforce Member has no right or ownership interest in any Confidential Information.

9. **Non-Disclosure.** Workforce Member understands and agrees that Confidential Information will not be used or disclosed by the Workforce Member in violation of this Confidentiality Agreement; applicable law, including, but not limited, to HIPAA; Federal and State records owner statute; the Practice's Notice of Privacy Practices, as amended from time to time; or other limitations as put in place by Practice from time to time.

    The intent of this Agreement is to ensure that the Workforce Member will use and access only the minimum amount of Confidential Information necessary to perform their required duties and will not disclose Confidential Information outside this Practice unless expressly authorized in writing to do so by this Practice.

    All Confidential Information received (or which may be received in the future) by the Workforce Member will be held and treated by him or her as confidential and will not be disclosed in any manner whatsoever, in whole or in part, except as authorized by this Practice and will not be used other than in connection with the employment relationship.

10. **Unattended Confidential Information.** The Workforce Member understands and agrees that he or she will not leave Confidential Information unattended (e.g., so that it remains visible).

11. **Computer, E-mail, Program, Database or Website Log-on Information and Passwords.** The Workforce Member agrees that his or her knowledge of any Practice computer, e-mail, program, database or website log-on information or password will not be disclosed to or used by anyone other than the Workforce Member. If the Workforce Member is not privy to any Practice computer, e-mail, program, database or website log-on information or password the Workforce Member will not attempt to learn any such Practice computer, e-mail, program, database or website log-on information or passwords.

    The Workforce Member will immediately notify this Practice's HIPAA Privacy Officer upon suspecting that any violation of this section occurs.

12. **Computer Systems.** The Workforce Member agrees that all computer systems are the exclusive property of Practice and will not be used by the Workforce Member for any purpose unrelated to the Workforce Member's duties.

13. **No Right to Privacy.** The Workforce Member acknowledges that he or she has no right of privacy when using this Practice's computer systems and that his or her computer use may and shall be periodically monitored by this Practice to ensure compliance with the Agreement, this Confidentiality Agreement, the Practice's Employee Handbook, and applicable law.

14. **Return of Confidential Information.** Immediately upon request by this Practice, the Workforce Member will return all Confidential Information to this Practice and will not retain any copies of any Confidential Information, except as otherwise expressly permitted in writing signed by this Practice.

    All Confidential Information, including copies thereof, will remain and be the exclusive property of this Practice, unless otherwise required by applicable law.

    To the extent that the Practice provides Workforce Member (or any agent or employee thereof) with any products, product specifications, materials, selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer/patient correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer and vendor lists, prospectus reports, customer or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, any and all such products, product specifications, materials, selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project

files, price lists, customer and vendor lists, prospectus reports, customer or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products, now in the possession of Workforce Member or acquired by Workforce Member during the Workforce Member's employment or affiliation with the Practice, shall be the exclusive property of the Practice and shall be returned to the Practice no later than the date of termination of Workforce Member's employment or affiliation with the Practice.

15. **Indirect Disclosure.** The Workforce Member specifically agrees that he or she will not allow anyone working on their behalf, or affiliated with the Workforce Member in any way to use, copy, disclose or disseminate any or all Confidential Information for any purpose.

16. **Direct Violations.** The Workforce Member understands that violating the terms of this Agreement may, in this Practice's sole discretion, result in disciplinary action including termination of employment and/or legal action to prevent or recover damages for breach.

17. **Failure to Report Violations.** The Workforce Member understands that **the Practice has a "zero-tolerance policy" for individuals that do not immediately advise the Practice related to other individual's (whether an employee of the Practice or otherwise) willful misuse, reproduction and/or distribution of any of the Practice's Confidential Information.** The Workforce Member agrees that if he or she sees another individual, employee or otherwise, misuse, reproduce or distribute any such Confidential Information, the Workforce Member will immediately report any such misuse, reproduction or distribution to the Practice. Knowing of such violation, and failing to report such misuse, reproduction or distribution, will be deemed by the Practice as complicity by the Workforce Member and will result in immediate termination and the Practice may, its sole discretion, institute appropriate legal action against the Workforce Member.

18. **Injunctive Relief.** The parties agree that any breach of this Confidentiality Agreement by the Workforce Member will result in irreparable injury to the Practice for which money damages are inadequate; therefore, in the event of a breach or an anticipatory breach, the Practice will be entitled (in addition to any other rights and remedies which it may have at law or in equity, including money damages) to have an injunction without bond issued enjoining and restraining the Workforce Member and/or any other person involved from breaching this Confidentiality Agreement.

    The Practice will be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of any litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses.

19. **Violation of the Agreement.**

    A. Specific Performance, Right to Injunctive Relief. Workforce Member agrees that a breach of any of the covenants contained in this Confidentiality Agreement will cause irreparable injury to the Practice for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Practice shall be entitled, in addition to any other rights and remedies they may have at law or in equity, to obtain an injunction to restrain Workforce Member (and/or any other person involved) from any threatened or actual activities in violation of any such covenants.

    The Workforce Member hereby consents and agrees that temporary and permanent injunctive relief may be granted in any proceedings that might be brought to enforce any such covenants without the necessity of proof of actual damages, and in the event Practice does apply for such an injunction, the Workforce Member shall not raise as a defense thereto that the Practice has an adequate remedy at law.

    B. Liquidated Damages. In addition to the rights set forth above, Workforce Member agrees that a breach of any of the covenants contained in this Confidentiality Agreement will cause irreparable injury to the Practice for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Practice shall be entitled to liquidated damages as follows:

i.   $100,000.00 for any intellectual property (as set forth in above) which is misappropriated with respect to the diminished reputation or value; and

ii.  $100,000.00 for any other trade secret misappropriated.

Workforce Member agrees that these amounts are reasonable in consideration of the harm which will befall the Practice for any misappropriation consistent with the agreement that actual damages may be impossible to otherwise quantify.

Nothing herein shall bar the Practice from seeking any other remedies available at law.

C.   <u>Compensatory and Anticipatory Damages</u>. Should a trade secret or other intellectual property be misappropriated by the Workforce Member, including, but not limited to, the use or sale of such intellectual property to a third-party, competing business, or should the Workforce Member use any intellectual property as set forth in this Confidentiality Agreement for their own personal gain, Workforce Member hereby agrees that it shall, upon demand, cease such misappropriation and, within thirty (30) days, forward all funds derived from such misappropriation to the Practice along with certified financial statements showing the value or remuneration obtained from such misappropriation. Should the Practice be forced to initiate legal action, Workforce Member agrees that, in addition to any other remedy available to the Practice, including those remedies set forth in this Confidentiality Agreement, damages shall include the total amount of value, monetarily, obtained by the Workforce Member or anticipated to be obtained by Workforce Member as a result of such misappropriation.

D.   <u>Attorney's Fees and Costs</u>. The Parties agree that, should the Practice be forced to initiate any actions for breach of this Confidentiality Agreement, or any covenants thereof, or as a matter of law; the Practice shall, if successful, be entitled to an award of its reasonable attorney's fees and costs associated with such action. Nothing herein shall permit the award of any award of counsel fees or costs to the Workforce Member in the event of a violation of the terms of this Confidentiality agreement or if the Practice is unsuccessful in such proceeding unless required by law.

20. **Integration.** This Confidentiality Agreement constitutes the entire understanding between the parties with respect to the subject matter herein, and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the Parties.

**WORKFORCE MEMBER ATTESTATION:**

- **I UNDERSTAND THAT BY VIRTUE OF MY EMPLOYMENT BY AND/OR AFFILIATION WITH THE PRACTICE I HAVE ACCESS TO CONFIDENTIAL INFORMATION THAT IF IMPROPERLY DISCLOSED, COPIED, OR DISSEMINATED WILL CAUSE IRREPARABLE HARM TO THE PRACTICE, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS.**

- **I HAVE READ AND UNDERSTOOD THE PRACTICE'S CONFIDENTIALITY AGREEMENT AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY OF MY OWN CHOOSING.**

- **I UNDERSTAND THAT IT IS MY LEGAL OBLIGATION TO MAINTAIN CONFIDENTIAL ALL CONFIDENTIAL INFORMATION OBTAINED DURING MY EMPLOYMENT OR AFFILIATION WITH THE PRACTICE.**

- **I UNDERSTAND THAT INAPPROPRIATE USE OR RELEASE OF CONFIDENTIAL INFORMATION IS GROUNDS FOR IMMEDIATE TERMINATION AND THAT ANY SUCH INAPPRORIATE USE OR RELEASE OF CONFIDENTIAL INFORMATION WILL SUBJECT ME TO POSSIBLE CIVIL AND CRIMINAL PENALTIES.**

**WORKFORCE MEMBER SIGNATURE**                                              **DATE**

X Farai Makoni Digitally signed by Farai Makoni
Date: 2018.02.01 12:48:21 -05'00'                              01/02/2018

E
X
H
I
B
I
T

B

# EXHIBIT B

# INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT (the "Agreement"), made this 31st day of July, 2018 by and between, NYC MEDICAL PRACTICE, P.C. d/b/a Goals Aesthetics and Plastic Surgery, a New York corporation having its principal place of business at 2792 Ocean Avenue, 2nd Floor, Brooklyn, New York 11229 (the "Practice") and David Shokrian, M.D. by and through his company, MILLENNIAL PLASTIC SURGERY PLLCa New York Professional Limited Liability Company (the "Physician") (each being referred to as a "Party" and may be referred to collectively as the "Parties").

WHEREAS, the Practice is a provider of medical services as defined under the laws of the State of New York and the United States, located in Brooklyn and Manhattan, New York, and primarily engaged in the practice of plastic and reconstructive surgery; and

WHEREAS, the Physician is a licensed physician under the laws of the state of New York as well as a Board Certified Plastic Surgeon; and

WHEREAS, it is deemed to be to the mutual advantage of the Practice and the Physician to create the within agreement for the mutual benefit of both parties; and

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the reasons set forth and in consideration of the covenants and promises of the parties hereto, parties agree as follows:

1. **EFFECTIVE DATE AND TERM.** All of the parties' rights and obligations under this Agreement shall be effective as of August 1, 2018, and shall continue for a term of Three (3) Years, until the termination of this Agreement (the "Term"). This initial Term shall extend for additional terms of One (1) Year by mutual written and signed agreement of the Parties subject to the terms and conditions herein unless modified by a subsequent writing which shall be incorporated into this and any other subsequent agreements as set forth hereinbelow.

2. **TERMINATION.** Termination. This Agreement may be terminated as follows:

   A. Without Cause. The Practice or Physician may terminate this Agreement at any time, without cause, upon ninety (90) days written notice to the other Party. Failure to notify the other Party of the intent to terminate without cause within the 90-day period shall be deemed a breach subject to the terms of this Agreement.

   B. With Cause. Either Party may terminate this Agreement for material breach of any of the terms, conditions or provisions of this Agreement with at least fifteen (15) days' prior written notice to the other Party specifying the nature of the basis for termination and/or breach of this Agreement. During the fifteen (15) day notice period, the breaching Party will have the opportunity to cure the breach, to the extent possible, to the reasonable satisfaction of the non-breaching Party.

C. Immediate Termination. The Practice may terminate this Agreement immediately upon written notice to the Physician in the event of any of the following:

    i. Death or disability of Physician; suspension, revocation, condition, expiration or other restriction of the licensure, certification and/or accreditation of Physician to perform services contemplated under this Agreement;

    ii. Suspension or bar of Physician from participation in federal health care programs;

    iii. Left Blank.

    iv. Non-compliance with the general and professional liability insurance requirements set forth in the Agreement;

    v. Felony conviction or guilty plea in connection with indictment or charges alleging commission of a felony;

    vi. The return of an indictment, criminal complaint, information or civil or administrative action filed against the Physician where the allegations made therein raise substantial question about the Physician's ability to perform medical services, or may place a financial risk to the Practices, such as, for example, the prescribing of medicine that is defined as a controlled substance under Federal or State law, or the sexual harassment or assault of a patient, whether at the Practice or elsewhere. ; or

    vii. The Practice's reasonable determination, in the reasonable discretion of the Practice, that Physician's immediate termination is necessary, because the Physician poses an imminent danger to for the health and safety of its patients.

### D. Premature Termination by Physician/Liquidated Damages

If, at any time within any Term as set forth and defined in the Independent Contractor Agreement, Physician terminates this Agreement in a manner that violates Section 2(A) of the Agreement,, then it is agreed by and between the Parties that the Practice will suffer an irreparable harm to which no adequate remedy may be available. . Further, in such a situation, the amount of monetary damages to which the Practice may and will suffer will be difficult if not impossible to quantify. Therefore, in the event that such an occurrence takes place, then, Physician shall pay to the Practice liquidated damages in the amount of ONE Thousand Dollars ($1,000.00) for each day the Physician has provided the Practice notice of termination less than the 90 days required by Section 2(A) of the Agreement. The sum shall represent a reasonable amount of damages based upon harm to which the Practice will suffer, both in lost income and losses relating to the loss of services of the Physician. Such liquidated damages may be withheld from any funds due and owing to the Physician from the Practice.

i.

E. Obligations Upon Termination. Upon termination of this Agreement for any reason whatsoever, Physician will continue to provide services to patients, as necessary, and to cooperate with the Practice to transition patients to other physicians in a manner that ensures medically appropriate continuity of care. The terms of this Agreement, including the compensation amounts set forth herein, shall apply to Physician's provision of such post-termination services as referenced herein, or within the scope of treatment and within the industry standard for continued treatment related to such procedure or care.

3.    **INDEPENDENT CONTRACTOR STATUS.**

A. The Physician shall be deemed an independent contractor associated with the Practice and not an employee or partner of the Practice. As such, Physician shall have the freedom to accept or reject work offered by the practice and shall set his/her own hours of work at any location related to the Practice and time away from the locations related to the Practice. Similarly, nothing herein shall bar the Physician from providing a substitute for certain services as provided by the Practice, if Physician is not available to provide these services as requested, although Practice shall have the sole and exclusive right to reject any substitute Physician. Any intended substitute shall be bound to the terms herein and equally or similarly qualified as Physician. Any intended substitute from Physician shall be identified and said qualification provided to Practice no less that fourteen (14) days prior to the intended substitution to permit the Practice to consult with said substitute to determined, in their sole discretion, whether they will permit substitute to perform the services of Physician. Physician shall be solely responsible for ensuring that the terms and conditions herein are complied with by any substitute and shall indemnify and defend the Practice with respect to any acts by any substitute.

B. The Physician shall not be treated as an employee with respect to the services performed hereunder for federal or state tax purposes. The Physician shall provide to the Practice an IRS Form W9 concurrent with the execution of this Agreement which provides the Tax Identification Number, not their Social Security Number, and shall be paid on an IRS Form 1099 basis and the Practice will not withhold any Federal, State or Local Income Taxes, Social Security, Unemployment Taxes for Physician or make any other employment related withholdings from any funds paid to the Physician by the Practice, regardless of the source of the funds. The Physician is PERSONALLY responsible for, and agrees to pay, any and all such taxes and amounts due and will maintain all expense records as required by law.

C. In an independent contractor relationship, the Practice provides no Worker's Compensation or Unemployment Insurance coverage of any kind for the Physician. The Physician is hereby notified that if Workers Compensation Insurance coverage is desired, the Physician must personally obtain coverage directly from a licensed insurance carrier at the Physician's sole expense.

4.    **WORK LOCATION.** As an independent contractor of the Practice, the Physician shall be granted a limited license, for the duration of this Agreement, to conduct all patient/client consultations and procedures at of the offices of the Practice.

5. **NO EXCLUSIVITY.** Nothing herein shall bar the Physician from providing medical services as either an employee of, or in any other relationship to, any other health care provider. Nothing in this Agreement shall prevent the Practice from working with other physicians.

6. **COMPENSATION.** The Physician will be paid on a per procedure basis in accordance with the Payment Schedule attached to this Agreement as <u>Schedule A</u>, which is incorporated into this Agreement. Payment will be made to Physician every two weeks, or as agreed in writing.. Any late payments shall be subject to a late fee of 12% per year.

7. **FEES FOR SERVICES.** Notwithstanding anything to the contrary, the Physician shall have no ownership interest in any amounts owned or collected by the Practice for medical services performed by the Physician pursuant to this Agreement. The Physician hereby unconditionally assigns to the Practice all amounts owned or collected for medical services performed by the Physician during the Term, or any subsequent term(s), and shall assist the Practice in billing and collecting such amounts, which shall be the sole and exclusive property of the Practice. Upon request of the Practice, the Physician shall execute and deliver such additional documents and instruments as may be necessary to evidence or effect the assignment of fees, including without limitation, any documents necessary in order to allow the Practice to bill and collect all amounts owed for medical services performed from any insurance carrier or any other third-party payors.

8. **DUTIES.** The Practice shall designate the patients/clients to which the Practice requests that the Physician consult with and/or to perform any desired and advisable medical and surgical procedures on said patients/clients, as well as any required pre and post-operative care. Subject to the terms herein, Physician has the right to reject providing services to any patient for any reason subject to the terms herein.

9. **MEDICAL RECORDS.** The Physician agrees to complete all required charting in the medical record of every patient/client serviced by the Physician in a prompt and timely manner and in accordance with any applicable policies and procedure of the Practice (a copy of which shall be provided to the Physician and the execution of the within Agreement shall constitute acknowledgment of receipt and review of said policies and procedures). The ownership and right of control of all reports, records and supporting documents prepared in connection with the services contemplated herein shall vest exclusively with the Practice and shall remain, at all times, at the office where services are provided; provided, however, that the Physician shall have such right of access to such reports, records and supporting documentation as necessary for the provision of professional services under this Agreement or for such matters as reasonably requested by Physician before or after termination of this Agreement.

10. **COMPLIANCE.** All parties shall at all times comply with all Applicable Law including, without limitation: (a) the Social Security Act and its implementing regulations; (b) CMS regulations, instructions, guidance, and memoranda, including all CMS accountability provisions (42 CFR

422.504(i)(3)(ii) and 422.504(i)(4)(v)); (c) the Health Insurance Portability and Accountability Act ("HIPAA") and its implementing regulations; (d) the Health Information Technology for Economic and Clinical Health and regulations promulgated thereunder ("HITECH Act"); (e) the federal Anti-Kickback Statute, as codified in 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute"), and State equivalents; (f) the federal prohibition against physician self-referrals of Medicare patients, as codified in 42 U.S.C. § 1395nn ("Stark Law"), and State equivalents; (g) the False Claims Act, as codified in 31 U.S.C. §§ 3729–3733, and State equivalents; (h) the Deficit Reduction Act of 2005 and its implementing regulations; (i) all applicable State laws and regulations, and any State laws regarding patients' advance directives as defined in the Patient Self Determination Act (P.L. 101-58); and all standards, rules and regulations of all accreditation bodies which have jurisdiction over the subject matter of this Agreement or the Parties' performance of their duties hereunder. The list above is non-exclusive, and All parties agree to comply with all applicable laws and, if necessary, assist one another with respect to these and any other obligations as required by any state or federal law.

11.  **FRAUD AND ABUSE**. All parties shall at all times comply with all federal and state fraud and abuse laws and regulations including, but not limited to, the Anti-Kickback Statute, Stark Law, and the False Claims Act.

12.  **NON-DISCRIMINATION**. All parties shall render services to all patients in the same manner, in accordance with the same standards, and within the same time availability, as to its other patients. Neither Provider nor the Practice, shall refuse to render services to any patient based on the patient's race, age, sex, sexual orientation, national origin, religion, color, health status or handicap, Benefit Plan or source of payment.

13.  **PHYSICIAN'S REPRESENTATIONS.** The Physician represents and warrants that:

   A.  The Physician is a qualified physician duly licensed to practice medicine in New York State.

   B.  The Physician has obtained a Tax Identification Number from the IRS for their business dealings as an independent contractor.

   C.  The Physician's license or certification in any state is not currently being and has never been suspended, revoked, restricted, or deemed to be probationary;

   D.  The Physician is not currently being and has never been reprimanded, sanctioned, or disciplined by any licensing or accrediting board;

   E.  There are no pending professional liability actions against the Physician and there has never been entered against him a final judgment in a professional liability action and no action, based on an

allegation of professional liability or malpractice by the him has ever been settled by payment to the plaintiff;

F. The Physician is not currently and has never been denied membership or reappointment of membership on the medical staff of any hospital, and none of his clinical privileges have ever been suspended, curtailed, or revoked;

G. As of the date hereof, the Physician has not been the subject of any report or disclosure to the National Practitioner Data Bank;

H. Throughout the Term, the Physician shall immediately notify the Practice in the event of any:

   i. Suspension, revocation or restriction of any state license or certification;

   ii. Reprimand, sanction or disciplinary action by any licensing or accreditation board;

   iii. Professional liability actions;

   iv. Denial of membership or reappointment to any affiliated hospital or the suspension or curtailment of any clinical privileges; and

   v. Report or disclosure against him to the National Practitioner Data Bank.

I. Throughout the Term of this Agreement, the Physician shall be solely responsible for keeping his or her medical license and medical credentialing current and effective and shall be solely responsible for any renewal fees.

14. **COURSE OF CONDUCT.**

A. The Physician agrees to act in a competent and professional manner in carrying out his or her duties under this Agreement and agrees that he shall make all clinical decisions using his best medical judgment consistent with the most current standards in the industry.

B. The parties agree to conform to, and abide by, all laws, rules and regulations, codes of ethics, and policies that are binding upon or applicable to physicians in the State of New York.

C. The parties agree to conduct his or her business in accordance with the rules, policies and procedures of the Practice.

15. **MALPRACTICE INSURANCE.** Throughout the Term of this Agreement, the Physician shall procure professional malpractice insurance with coverage of <u>at least</u> One Million Dollars ($1,000,000) per

occurrence and Three Million Dollars ($3,000,000) aggregate. Physician shall add the Practice locations to his list of practice locations.

16. **INDEMNIFICATION.** To the extent permissible by law.:

A. The parties agree to indemnify and hold harmless the other party, its principals, employees, officers, agents and representatives from, and against, any losses, costs, damages, and expenses resulting from claims for bodily injury arising out of the indemnifying party's acts, omissions, including but not limited to breaches and misreprsentations in connection with this Agreement.

B.

C. The Physician agrees that in no event including, but not limited to, nonpayment by Practice, the Practice's determination that services were not Medically Necessary, the Practice's insolvency, or the Practices' breach of this Agreement, shall Physician bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any patient of the Practice, or persons other than the Practice acting on any patient's behalf, for amounts that are the legal obligation of Practice. The Parties agree that this provision shall be construed for the benefit of patients.

17. **AUTHORIZATION TO WORK IN THE UNITED STATES.** The Physician represents and warrants that he is authorized to legally work in the United States and shall immediately furnish proof of the same to the Practice.

18. **MISCELLANEOUS PROVISIONS.**

A. INTEGRATION. This Agreement and the attached Schedules A-D, which are incorporated by reference, contain the entire understanding between the parties and supersedes any prior discussions negotiations, agreements or understandings.

B. AMENDMENTS. This Agreement may not be altered, amended, canceled, revoked or otherwise modified except by written agreement subscribed by the Physician and the Practice.

C. SURVIVAL AND MODIFICATION OF PROVISIONS. In the event that any one or more of the provisions or portion of any provision of a provision of this Agreement is held to be invalid, unlawful or unenforceable, the invalid, unlawful or unenforceable provision (or portion thereof) shall be construed or modified so as to provide the Parties with the maximum protection that is valid, lawful and enforceable, consistent with the intent of the Physician and Practice in entering into this Agreement. If such provision (or portion thereof) cannot be construed or modified so as to be valid, lawful and enforceable, that provision (or portion thereof) shall be construed as narrowly as possible

and shall be severed from the remainder of this Agreement (or provision), and the remainder shall remain in effect and be construed as broadly as possible, as if such invalid, unlawful or unenforceable provision (or portion thereof) had never been contained in this Agreement.

D. **NOTICES.** All required notices must be in writing and will be considered given when delivered:

    i.    Personally, with a signed acknowledgment;

    ii.    By registered or certified mail, return receipt requested, addressed as follows (or any other address that is specified in writing by either party):

        *If to Practice*: Goals Aesthetics and Plastic Surgery, 2790 Ocean Ave, 2nd Floor, Brooklyn, New York 11229

        *If to Physician*: c/o Raymond Iryami, Esq., Raymond Iryami Law Firm P.C. 305 Madison Avenue, 46th Floor, New York, New York 10165; or

    iii.    By e-mail at the address the following e-mail address, provided, no "Undeliverable" message is received:
        *If to Practice*: _____
        *If to Physician*: _____

E. **WAIVER.** The failure of a Party to insist upon strict performance of any obligation or provision of this Agreement shall not be construed as a waiver thereof nor deprive that Party of the right thereafter to insist upon the strict performance of any obligation or provision of this Agreement.

F. **REMEDIES.** The remedies provided in this Agreement and the attached schedules are cumulative. Unless otherwise specified, a party who asserts a right or seeks a remedy may also assert other rights or seek other remedies.

G. **HEADINGS AND SYNTAX:** The headings set forth in this Agreement are for convenience and reference only and are not intended to modify, limit, enlarge, describe or affect in any way the content, scope or intent of this Agreement. All references made and pronouns used shall be construed in the singular or the plural and in such gender as common sense and circumstances indicate and require.

H. **CONSTRUCTION AND INTERPRETATION.** This Agreement shell be deemed as having been prepared by the joint efforts of the Parties. The Parties acknowledge and agree that the usual rules of construction, to the effect that ambiguities in a document are to be resolved against the drafting party, shall not be employed in the interpretation of this Agreement and that this Agreement shall be construed as if jointly prepared by all Parties.

I.  CHOICE OF LAW AND VENUE. This Agreement and any other documents referred to herein shall be governed by, construed, and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles.  Any disputes, whether related to the enforcement or interpretation of any clause or provision herein shall be adjudicated in the State or Federal Courts located in Kings County, New York.

J.  AUTHORITY: Each Party whose signature is affixed hereto represents and warrants that he or she is authorized to execute this Agreement on behalf of the entity or individual on whose behalf his signature is affixed and that he or she is acting in the scope of such agency and authority. Each Party specifically represents and warrants that no signatures other than those made on this Agreement are necessary to bind the Parties to all of the obligations imposed by the Agreement, and to render this Agreement legal, valid and binding upon the Parties.

K.  FURTHER ASSURANCES: Physician and Practice agree to execute such other documents and to take such other action as may be reasonably necessary to further the purposes of this Agreement.

L.  ORGANIZATION AND AUTHORITY. Each of the Parties represents and warrants, with respect to itself or himself or herself only, that:

     i.  if such a party is an entity:

          a.  it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and organization; and

          b.  it has the requisite power and authority to enter into this Agreement and to perform all of its, as applicable, obligations under this Agreement;

     ii.  the execution and delivery of this Agreement and the performance by such party of its obligations under this Agreement has been authorized by all requisite action on its part;

     iii.  there are no other persons or entities whose consent or joinder to this Agreement is necessary to make fully effective those provisions of this Agreement that obligate, burden, bind or apply to it or him/her, as applicable; and

     iv.  it or he/she, as applicable, has not transferred, assigned, or ledged to any third party, any right set forth in this Agreement.

M.  CONSENTS AND APPROVALS; NO VIOLATIONS.  Each of the Parties represents and warrants, with respect to itself only, that neither the execution nor the delivery of this Agreement by any such Party, nor the performance by any such Party or its obligations hereunder will:

     i.  Violate the certificate of incorporation, by-laws, or any other organizational document of such party;

      ii.  Conflict in any material respect with or result in a material violation or breach of, or constitute a material default under, any material contract, agreement, or instrument to which such a Party is a party; or

      iii.  Violate or conflict in any material respect with any rule, regulation, judgment, order or decree of any court, administrative agency or governmental authority applicable to such party.

N. NO THIRD-PARTY BENEFICIARIES. No provision of this Agreement will be deemed to be construed in any way to result in the creation of any right or obligation in any person or entity not a party to this Agreement or not identified in this Agreement.

O. INDEPENDENT ATTORNEY REVIEW. Each of the Parties represents that, before executing this Agreement, each such Party has read this Agreement thoroughly, has consulted with legal counsel, and understands the meaning and effect of this Agreement. Each of the Parties further represents that, in executing this Agreement, each such Party is fully cognizant of the rights being granted and/or relinquished pursuant to this Agreement and the consideration therefore. Additionally, should either Party to this Agreement fail or otherwise not have an attorney review this Agreement, the Party agrees and acknowledges that the failure to have an attorney review the document before execution is done on their own free will, nobody forced them to execution this contract without the benefit of attorney review, they agree to be bound to the terms, and, should any dispute arise, they agree and understand that they waive and shall not use the argument or defense that they executed this Agreement lacking attorney consultation. The failure to retain or rely upon an attorney prior to the execution of this Agreement, each party agrees and acknowledges, is a full waiver of the right to counsel review.

**The Undersigned enter this Agreement knowingly and voluntarily and do so with the full authority of the Undersigned, and if a business entity, with the fully authority to bind said entity.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the first date written above.

PRACTICE: Goals Aesthetics and Plastic Surgery        **PHYSICIAN:**

X _____        X _____

By: _____

Title: _____

Attachments:
- *Schedule A: Payment Schedule*
- *Schedule B: HIPAA Confidentiality Agreement and Training Attestation*
- *Schedule C: Confidentiality Agreement*

• *Schedule D: Non-Solicitation Agreement*

## SCHEDULE A: COMMISSION SCHEDULE

1. For any liposuction and/or fat transfer procedure or BBL:   $1,000.00 per surgery

PRACTICE: Goals Aesthetics and Plastic Surgery          PHYSICIAN:

X                                                        X

By:

Title:

)

## SCHEDULE B: HIPAA CONFIDENTIALITY AGREEMENT AND TRAINING ATTESTATION

*This HIPAA Confidentiality Agreement applies to all Goals Aesthetics and Plastic Surgery Workforce Members, including: employees, independent contractors, medical staff and other health care professionals; volunteers; agency, temporary and registry personnel; and house staff, students, and interns.*

## HIPAA PROTOCOL AND PROCEDURES FOR ALL GOALS AESTHETICS AND PLASTIC SURGERY WORKFORCE MEMBERS

Goals Aesthetics and Plastic Surgery is committed to maintaining the strictest privacy and confidentiality standards in the use and handling of any and all medical information we have access to.

The Privacy Rule of the Health Insurance Portability and Accountability Act ("HIPAA") governs the use and release of patient identifiable information by health care providers. The Office of Civil Rights is charged with the responsibility for the Privacy Rule part of the law.

Because information is so readily available by e-mail, fax, internet, electronic records it can easily be obtained by people that do not need tom know the information and could potentially misuse the information. HIPAA's privacy rule addresses the following:

1. Greater restrictions for the use and disclosure of personal health information;
2. Patients have more access to and control and protection of their health information;
3. Establishes appropriate safeguards that healthcare providers must achieve to protect the privacy of health information;
4. Holds violators accountable with criminal and civil penalties that can be imposed if they violate patient's privacy rights; and
5. Balances public responsibility to disclose some forms of data to protect public health.

All Workforce Members of Goals Aesthetics and Plastic Surgery are considered "covered" entities, that is, a people or organizations that have access to protected health information and share that information electronically. As such, **every Workforce Member, including Physician, is required to follow the HIPAA Privacy Rule(s).**

## PROTECTED HEALTH INFORMATION (PHI)

All Workforce Members are required to know what information is covered under the rule and the types of information they are legally able to access and use. Commonly referred to as *individually identifiable health information* and *protected health information* or simply, PHI, both phrases are essentially the same and refer to health information or patient/client information that the patient/client shares with a health care entity (i.e.: Goals Aesthetics and Plastic Surgery). This includes, but is not limited to: information regarding a patient/client's medical history, mental, or physical condition or treatment, as well as the patient/client's family member records, test results, conversations, research records and financial information.

Some information may not be considered PHI alone, but with other information it may be like pieces to a puzzle that could lead to the identification of patient/client. For example, a zip code is not normally a piece of information that can identify a patient, but together with an insurance card and a telephone number, it is possible to identify that person as a patient. If the information can reasonably be connected to the person's identity, then it is considered PHI in that instance.

### All health information that identifies an individual is considered PHI

It does not matter if Goals Aesthetics and Plastic Surgery is responsible for creating the information or if it receives it from another source such as a hospital, insurance company or other healthcare office. Under the HIPAA law, it is treated the same, as confidential information.

### PHI can be oral, written or electronic information

A simple conversation between the doctor and the nurse about a patient/client and the diagnosis is considered the same as written information or electronically communicated PHI.

Examples of PHI include, but are not limited to:

- Physical medical and psychiatric records including: electronic; paper; photo; video; diagnostic and therapeutic reports; and/or laboratory and pathology samples;
- Patient insurance and billing records;
- Computerized patient data;
- Visual observation of patients receiving medical care or accessing services;
- Verbal information provided by or about a patient; and/or
- Personal information such as: name, address, telephone number, e-mail and social security.

## RULES FOR THE USE AND DISCLOSURE OF PHI

To "Use" PHI means to access, view, examine, analyze and share information. To "Disclose" PHI means to release to, transfer to and or make information available to someone who is not an Goals Aesthetics and Plastic Surgery Workforce Member or to Goals Aesthetics and Plastic Surgery Workforce Member that is not authorized to receive such PHI.

Workforce Members may only Use and Disclose PHI for the following purposes:

1. Generally, for treatment, payment processing, and healthcare operations purposes. The law deems it appropriate for Workforce Members to access and use certain information to complete certain job responsibilities, accordingly, the patient/client does not need to provide written authorization to use and disclose such PHI;

2. If the patient/client or authorized individuals authorizes such use and disclosure in writing; and

3. If the patient/client or authorized individual demands that such PHI be disclosed to the patient/client or authorized individual.

## ROUTINE AND NON-ROUTINE REQUESTS NOT RELATED TO TREATMENT

If information is directly related to the job responsibilities that each Workforce Member must do, generally it can be disclosed. If the information is not within that Workforce Member's job responsibility, then they must go to the designated person responsible for requests and disclosures at Goals Aesthetics and Plastic Surgery and advise that individual of that request.

## GUIDELINES TO PROTECT THE PRIVACY OF HEALTH INFORMATION

# **HOW TO PROTECT PATIENT PRIVACY**

1. All Workforce Members are required to keep patient records in a designated area, away from any place that is accessible to unauthorized individuals or casual viewers;
2. All Workforce Members must refrain from discussing any and all patient information in any public places, and make sure all formal and informational patient consultations are held in areas that have limited access to unauthorized individuals;
3. All Workforce Members must remember to log off computer terminals so that confidential information cannot be viewed by on lookers;
4. All Workforce Members must refrain from leaving papers around; all paperwork should be filed immediately upon creation or receipt, as appropriate;
5. All Workforce Members should utilize designated fax or copier machines for faxing or copying patient information. If no machine is specifically designated, fax or copy information in an area that has limited or no access to unauthorized individuals.

## **PRIVACY OFFICER**

HIPAA requires each organization that uses PHI to appoint a Privacy Officer to facilitate the implementation of these privacy rules. The Privacy Officer may designate a person to be responsible for implementing and maintaining most of these processes and the Privacy Officer retains oversight and responsibility for the entire program. It is every Workforce Member's responsibility to know the name and contact number of the designated individuals that have been assigned responsibility for complaints and other requests related to patient privacy. The Privacy Officer may be changed from time to time and any change shall be notified to all Workforce Members.

The Privacy Officer for Goals Aesthetics and Plastic Surgery is currently:

_____.

## **NOTICE OF PRIVACY PRACTICES**

Goals Aesthetics and Plastic Surgery has a privacy practice designated to protect the privacy and confidentiality of patient protected health information. The Federal Government requires that each organization provides each patient a "Notice of Privacy Practice". This is developed by the organization that defines policies as to how the organization may Use and Disclose patient personal health information. Privacy notices are distributed to patients only once and usually upon admission and upon request to any member of the public. Copies of the receipt for the Notice of Privacy Practices will be kept on file for a period of 6 years. Notice of Privacy Practice is given at the first time of the patient encounter. Parents have access to the files of their children under the age of 18.

## PATIENT PRIVACY RIGHTS

The patient also has the following rights regarding the use and disclosure of his or her protected health information without fear of retaliation. In addition, patients cannot be asked to waive their rights as a condition of treatment and payment:

1. A patient has the right to receive the Privacy Notice at the time of first service;
2. A patient has the right to request restrictions or limitations on how their protected health information is used or disclosed for treatment, payment or healthcare operations;
3. Any restriction request must be forwarded to the privacy officer;
4. Health care organizations will choose a method of identifying a record containing restricted information. A notation is made in the patient's medical record indicating that restrictions to the Use and/or Disclosure of protected health information is in force. For example, a brightly colored sticker can be used to indicate there are restrictions contained in the medical record;
5. The patient has the right to identify alternative means of communication and alternative locations that they wish to have their protected health information communicated for the purpose of maintaining confidentiality. This alternative method is different than the usual practice that the facility would use. This can include but not be limited to sending bills to a PO BOX as opposed to a home address, sending medical information via certified, not regular mail, etc.;
6. The patient has the right to request access to their health information for inspection and/or copying. This request is made in writing. Additionally, the patient may request to amend or change his or her health information by requesting to do so in writing; and
7. The patient has the right to request in writing, an accounting of disclosures of health care information other than treatment, payment or health care operations.

## CONSEQUENCES FOR BREAKING THE RULES

There are penalties for anyone that intentionally violates the HIPAA Privacy Rule. **All Workforce Members are subject to possible penalties by the Office of Civil Rights, including civil and criminal penalties.** Criminal penalties can include rather hefty monetary penalties and or jail time. Examples of criminal actions include knowingly releasing information in violation of the law or selling the information.

Furthermore, **any Goals Aesthetics and Plastic Surgery Workforce Member that intentionally violates the HIPAA Privacy Rule will be subject to immediate termination** from Goals Aesthetics and Plastic Surgery.

**Goals Aesthetics and Plastic Surgery has a zero-tolerance policy for Workforce Members that turn a blind eye to other Workforce Member's willful violations of the HIPAA Privacy Rule.** Any Workforce Member that sees another Workforce Member violate these rules, whether such violation is accidental or on

purpose, must report the violation to the Privacy Officer. **Knowing and failing to report such willful violations will deem that Workforce Member complicit and will result in immediate termination.**

## PHYSICIAN DOCUMENTATION OF HIPAA PRIVACY TRAINING

HIPAA requires that Goals Aesthetics and Plastic Surgery's Privacy Officer train all Workforce Members on Goals Aesthetics and Plastic Surgery's health information privacy policies and procedures to the HIPAA Omnibus Standards of 2013, which also includes HI-TECH and Protected Health Information (PHI), Electronic Protected Health Information (ePHI) and Electronic Health Records (EHR).

All Workforce Members with treatment, payment or healthcare operations responsibilities, which allow access to PHI, are trained with updates periodically as State and Federal mandates require. HIPAA also requires that Goals Aesthetics and Plastic Surgery keep this documentation (that the training was completed) for six (6) years after the training.

I, _David Shotzien_, **HAVE READ AND UNDERSTOOD GOALS AESTHETICS AND PLASTIC SURGERY'S POLICY WITH REGARD TO THE HIPAA PRIVACY RULE AND THE PRIVACY, SECURITY, USE AND RELEASE OF PHI. I AGREE TO MAINTAIN CONFIDENTIALITY OF ALL INFORMATION OBTAINED IN THE COURSE OF MY AFFILIATION/ASSOCIATION INCLUDING, BUT NOT LIMITED TO: FINANCIAL, TECHNICAL, OR PROPRIETARY INFORMATION OF GOALS AESTHETICS AND PLASTIC SURGERY AND PERSONAL AND SENSITIVE INFORMATION REGARDING PATIENTS, EMPLOYEES, INDEPENDENT CONTRACTORS AND VENDORS. I UNDERSTAND THAT INAPPROPRIATE USE OR RELEASE OF PATIENT INFORMATION IS GROUNDS FOR IMMEDIATE TERMINATION AND THAT ANY SUCH INAPPRORIATE USE OR RELEASE OF PHI WILL BE REPORTED AND SUBJECT ME TO POSSIBLE PENALTIES FROM THE OFFICE OF CIVIL RIGHTS, INCLUDING CIVIL AND CRIMINAL PENALTIES, SUCH AS JAIL TIME AND FINES.**

SIGNED AND AGREED: _____

## SCHEDULE C: CONFIDENTIALITY/INTELLECTUAL PROPERTY/TRADE SECRETS AGREEMENT

The Practice and the Physician as set forth in the Agreement to which this Confidentiality/Intellectual Property/Trade Secret Agreement (the "Confidentiality Agreement") is attached, also agree to set forth the terms and conditions under which information created or received by or on behalf of this Practice including Confidential Information as defined below and Protected Health Information ("PHI") as defined in Schedule B to the Agreement and which is incorporated herein by reference when applicable, may be used or disclosed under this Confidentiality Agreement, state law and the Health Insurance Portability and Accountability Act of 1996 and updated through HIPAA Omnibus Rule of 2013 and will also uphold regulations enacted there under (hereafter "HIPAA").

1. **Consideration.** In consideration of the Physician's execution of the Agreement, the Physician will be entitled to the Compensation and other benefits conferred onto the Physician by the Independent Contractor Agreement (the "Agreement") as Schedule A, to which this Confidentiality Agreement is attached as Schedule C and which is incorporated herein by reference. No separate monetary consideration shall be provided to the Physician with respect to this Confidentiality Agreement as the consideration set forth in the Agreement shall be deemed as good, valid, and sufficient consideration for this Confidentiality Agreement as well.

2. **Confidential Information.** All Parties, as defined in the Agreement, acknowledge that, in providing the services as set forth in the Agreement, and subject to the terms and conditions therein, may or will necessitate disclosure of confidential information by the Practice to the Physician and the use of Confidential Information by the Physician.

   For purposes of this Confidentiality Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which the Practice is primarily engaged including, but not limited to, any trade secrets as defined below, or any intellectual property of the Practice. If Confidential Information is in written form, other than PHI, the Practice shall label or denote the materials with the word "Confidential" or some similar warning. If Confidential Information is transmitted orally, except PHI, the Practice shall promptly provide a writing indicating that such oral communication constituted Confidential Information if necessary. In addition, Confidential Information shall also include the following non-exhaustive list:

   - PHI (as this term is defined in Schedule B of the Agreement);
   - Any information about patients of the Practice or employees of the Practice, including, but not limited to, employee names, addresses, telephone numbers, e-mails, social media accounts, spouse or children information, and/or social security information or numbers;
   - Any computer owned, used or maintained by the Practice, including any, e-mail, program, database or website log-on information or passwords thereto;
   - Any patient records or billing information;

- Any information that concerns the Practice's contractual relationships, relates to the Practice's competitive advantages, or is otherwise designated as confidential by this Practice as set forth and discussed herein below;

- Any information obtained from the Practice's records which if disclosed, would constitute an unwarranted invasion of privacy; and

- Any confidential business information that would cause harm to the Practice if disclosed.

Other than PHI, the following terms apply to the Confidential Information as PHI is subject to legal obligations under State and Federal Law:

A. Exclusions from Confidential Information. Physician's obligations under this Confidentiality Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Physician; (b) discovered or created by Physician before disclosure by the Practice; (c) learned by the Physician through legitimate means other than from the Practice or the Practice's representatives; or (d) is disclosed by the Physican with the Practice's prior written approval of such information provided to the Physican from the Practice and specifically denoted as to be forwarded or disclosed to potential third-parties to which the Practice has granted to the Physician in writing.

B. Obligations of the Physician. The Physician shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Practice. Physician shall carefully restrict access to Confidential Information to employees, contractors, and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Confidentiality Agreement if necessary. Physician shall not, without prior written approval of the Practice, use for Physician's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of the Practice, any Confidential Information. The Physician shall return to the Practice any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if the Practicet requests it in writing and/or consistent with the terms herein.

C. Time Period for Maintenance of Confidence. The nondisclosure provisions herein shall survive after the termination of this Agreement and Physician's duty to maintain and hold such Confidential Information in confidence shall remain in effect until the Practice ceases operations, or until the Practice sends Physician written notice releasing Physician from this Confidentiality Agreement, or after ten (10) years elapsed from the termination of the Agreement, whichever occurs first.

D.  Notwithstanding the foregoing, nothing in this Agreement shall be construed to bar the disclosure of any such confidential information:

    i.  Upon the written consent of all Parties;

    ii.  In response to an order of a court of competent jurisdiction following reasonable notice (not fewer than 2 business days) to the Parties in accordance with the notice provisions set forth in the Agreement;

    iii.  In response to any inquiry or order issued by a state or federal agency of competent jurisdiction provided that the receiving Party gives reasonable notice (not fewer than 2 business days) to the other Party in accordance with the notice provisions set forth in the Agreement;

    iv.  To the extent necessary, to appropriate taxing authorities;

    v.  To any Party's accountants, attorneys, financial advisors, and/or tax advisors and then only upon the agreement of the above-referenced third-parties to maintain the confidentiality of the Confidential Information; or

    vi.  In connection with the enforcement of this Agreement.

For purposes of this section, the term "an order of a court of competent jurisdiction" shall not mean a deposition notice or demands for discovery or a subpoena.

3. **Trade Secrets.** By way of entering into this Agreement, Physician may receive or otherwise become privy to unique, specialized, and/or confidential information concerning the Practice's business operations, including, but not limited to, operating techniques and procedures, marketing techniques and procedures, financial data, processes, vendors and other information that was developed and maintained at considerable effort and expense to the Practice, for the Practice's sole and exclusive use, and which if used by the Practice's competitors, would give those competitors an unfair business advantage.

Physician understands and agrees that it shall not provide any other business, medical practice, entity, person or other with any of Practice's trade secrets as described herein without prior written authorization from the Practice.

4. **Intellectual Property - Inventions, Ideas, Processes, and Designs.** Each Party advises that it comes, or may come, to the Agreement with its own inventions, ideas, processes and designs (including improvements), and that any such invention, idea, process and design (including improvements) are, and shall remain the sole and exclusive property of the Party which brings such invention, idea, process and design (including improvements).

All inventions, ideas, processes, and designs (including all improvements): (i) conceived or made by Physician or any agent of Physician during the Term of the Agreement (whether or not actually conceived during regular business hours); and (ii) related to the business of the Practice, shall be disclosed in writing promptly to the Practice and ownership shall be equally shared between the Physician and Practice subject to the limitations set forth below. An invention, idea, process or design (including an improvement) shall be deemed "related to the business of the Practice" if: (a) it was made with equipment, supplies, facilities, or confidential

*information* of the Practice; (b) results from work performed by Physician pursuant to the terms of the Agreement; or (c) pertains to the current business or demonstrably anticipated research or development work of the Practice.

Notwithstanding anything to the contrary, if Physician, during the Term of Agreement, and related to the services provided to the Practice as set forth in the Agreement, suggests, assists, works on, or otherwise modifies any process or any existing intellectual property of the Practice to which the Practice has a trademark, patent or copyright, either statutorily or under common law; any suggestions, changes, edits, modification, amendments, designs, versions or updates to such trademarked, patented or copyrighted intellectual property of the Practice shall remain the sole and exclusive property of the Practice and Physician shall, upon the request of the Practice, provide in writing a waiver of any potential rights thereto.

The Physician and any agent of Physician shall cooperate with the Practice, or any such individual or entity as Practice assigns said intellectual property, and their attorneys, in the preparation of patent, trademark and copyright applications for such developments and, upon request, shall promptly assign all such inventions, ideas, processes, and designs to the Practice as set forth in this section. The decision to file for patent, trademark or copyright protection, or to maintain such development as a trade secret, shall be in the sole and exclusive discretion of the Practice and Physician shall be bound by such decision.

Further, and notwithstanding anything to the contrary, all photographs and videos or other visual medium documenting surgical or aesthetic procedures performed by the Physician on behalf of the Practice, taken by the Practice or the Physician, shall remain the sole and exclusive intellectual property of the Practice and NOT THE PHYSICIAN. The visual medium discussed herein includes, but is not limited to, patient "before and afters" (photographs and/or videos and/or other visual medium of patients before their procedures and after their procedures); patient surgical or cosmetic procedures; patient surgical or cosmetic consultations; and/or interview or Q&A sessions with the Practice or the Physician.

5. **Types of Disclosure and Use.** Physician understands and agrees that the disclosure and use of Confidential Information includes oral communications as well as display, reproduction or distribution of tangible physical documentation, in whole or in part, from any source or in any format (e.g., paper, digital, electronic, internet, social network postings on platforms such as Facebook, Twitter, Instagram, Snapchat, etc., magnetic or optical media, film, etc.).

6. **Ownership of Confidential Information.** Physician understands and agrees that the Practice, not the Physician, is the owner under state and/or federal law and the Physician has no right or ownership interest in any Confidential Information.

7. **Non-Disclosure.** Physician understands and agrees that Confidential Information will not be used or disclosed by the Physician in violation of this Agreement; applicable law, including, but not limited, to HIPAA; Federal

Confidential Information unattended (e.g., so that it remains visible).

9. **Computer, E-mail, Program, Database or Website Log-on Information and Passwords.** The Physician agrees that his or her knowledge of any Practice computer, e-mail, program, database or website log-on information or password will not be disclosed to or used by anyone other than the Physician. If the Physician is not privy to any Practice computer, e-mail, program, database or website log-on information or password the Physician will not attempt to learn any such Practice computer, e-mail, program, database or website log-on information or passwords.

The Physician immediately will notify this Practice's HIPAA Privacy Officer upon suspecting that any violation of this paragraph occurs.

10. **Computer Systems.** The Physician agrees that all computer systems are the exclusive property of Practice and will not be used by the Physician for any purpose unrelated to the services as set forth in the Agreement.

11. **No Right to Privacy.** The Physician acknowledges that he or she has no right of privacy when using this Practice's computer systems and that his or her computer use may and shall be periodically monitored by this Practice to ensure compliance with the Agreement, this Confidentiality Agreement, and applicable law.

12. **Return of Confidential Information.** Immediately upon request by this Practice, the Physician will return all Confidential Information to this Practice and will not retain any copies of any Confidential Information, except as otherwise expressly permitted in writing signed by this Practice.

All Confidential Information, including copies thereof, will remain and be the exclusive property of this Practice, unless otherwise required by applicable law.

To the extent that the Practice provides Physician, or any agent or employee thereof, with any products, product specifications, materials, selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer/patient correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer and vendor lists, prospectus reports, customer or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, any and all such products, product specifications, materials, selection and testing materials, marketing and advertising materials, special event, charitable and community activity materials, customer correspondence, internal memoranda, products and designs, sales information, project files, price lists, customer and vendor lists, prospectus reports, customer or vendor information, sales literature, territory printouts, call books, notebooks, textbooks, and all other like information or products, including all copies, duplications, replications, and derivatives of such information or products, now in the possession of Physician or acquired by Physician while providing the services as set forth in the Agreement, shall be the exclusive property of the Practice and shall be returned to the Practice no later than the date of termination as set forth in the Agreement or at the expiration of any Term as set forth in the Agreement.

13. **Indirect Disclosure.** The Physician specifically agrees that he or she will not allow anyone working on their behalf, or affiliated with the Physician in any way to use, copy, disclose or disseminate any or all Confidential Information for any purpose.

14. **Direct Violations.** The Physician understands that violating the terms of this Agreement may, in this Practice's sole discretion, result in disciplinary action including termination of employment and/or legal action to prevent or recover damages for breach.

15. **Failure to Report Violations.** The Physician understands that the Practice has a "zero-tolerance policy" for individuals that do not immediately advise the Practice related to other individual's (whether an employee of the Practice or otherwise) willful misuse, reproduction and/or distribution of any of the Practice's Confidential Information. Physician agrees that if he or she sees another individual, employee or otherwise, misuse, reproduce or distribute any such Confidential Information, the Physician will immediately report any such misuse, reproduction or distribution to the Practice. Knowing of such violation, and failing to report such misuse, reproduction or distribution, will be deemed by the Practice as complicity by the Physician and will result in immediate termination pursuant to the terms of the Agreement and the Practice may, its sole discretion, institute appropriate legal action against the Physician.

16. **Injunctive Relief.** The parties agree that any breach of this Confidentiality Agreement by the Physician will result in irreparable injury to the Practice for which money damages are inadequate; therefore, in the event of a breach or an anticipatory breach, the Practice will be entitled (in addition to any other rights and remedies which it may have at law or in equity, including money damages) to have an injunction without bond issued enjoining and restraining the Physician and/or any other person involved from breaching this Agreement.

The Practice will be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of any litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses.

## 17. Violation of the Agreement

### A. Specific Performance, Right to Injunctive Relief.

Physician agrees that a breach of any of the covenants contained in this Confidentiality Agreement will cause irreparable injury to the Practice for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Practice shall be entitled, in addition to any other rights and remedies they may have at law or in equity, to obtain an injunction to restrain Physician from any threatened or actual activities in violation of any such covenants.

The Physician hereby consents and agrees that temporary and permanent injunctive relief may be granted in any proceedings that might be brought to enforce any such covenants without the necessity of proof of actual damages, and in the event Practice does apply for such an injunction, the Physician shall not raise as a defense thereto that the Practice has an adequate remedy at law.

### B. Liquidated Damages.

In addition to the rights set forth above, Physician agrees that a breach of any of the covenants contained in this Confidentiality Agreement will cause irreparable injury to the Practice for which the remedy at law may be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Practice shall be entitled to liquidated damages as follows:

   i. $10,000.00 for any intellectual property set forth in above which is misappropriated with respect to the diminished reputation or value of Compliant in the community with respect to the misappropriated intellectual property; and

   ii. $10,000.00 for any other trade secret misappropriated.

Physician agrees that these amounts are reasonable in consideration of the harm which will befall the Practice for any misappropriation consistent with the agreement that actual damages may be impossible to otherwise quantify.

Nothing herein shall bar the Practice from seeking any other remedies available at law.

### C. Compensatory and Anticipatory Damages

Should a trade secret or other intellectual property be misappropriated by the Physician, including, but not limited to, the use or sale of such intellectual property to a third-party, competing business, or should the Physician use any intellectual property as set forth in this Agreement for their own personal gain, Physician hereby agrees that it shall, upon demand, cease such misappropriation and, within 30 days, forward all funds derived from such misappropriation to the Practice along with certified financial statements showing the value or remuneration obtained from such misappropriation. Should the Practice be forced to initiate legal action, MCS agrees that, in addition to any other remedy available to the Practice, including those remedies set forth in this Confidentiality Agreement, damages shall include the total amount of value, monetarily, obtained by the Physician or anticipated to be obtained by Physician as a result of such misappropriation.

18. **Integration.** This Confidentiality Agreement and the Agreement to which this Agreement is attached, which is hereby incorporated by reference, constitutes the entire understanding between the parties with respect to the subject matter herein, and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the Parties. Specifically, each and every term in Section 18 of the Agreement (Miscellaneous Terms) are deemed repeated herein and incorporated by reference as though each term was written here in full.

I, _____, UNDERSTAND THAT BY VIRTUE OF MY RETENTION BY GOALS AESTHETICS AND PLASTIC SURGERY, PURSUANT TO THE AGREEMENT, I HAVE ACCESS TO CONFIDENTIAL INFORMATION THAT IF IMPROPERLY DISCLOSED, COPIED, OR DISSEMINATED WILL CAUSE IRREPARABLE HARM TO GOALS AESTHETICS AND PLASTIC SURGERY, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS.

I HAVE READ AND UNDERSTOOD GOALS AESTHETICS AND PLASTIC SURGERY'S CONFIDENTIAL INFORMATION AGREEMENT AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY OF MY OWN CHOOSING.

I UNDERSTAND THAT IT IS MY LEGAL OBLIGATION TO MAINTAIN CONFIDENTIAL ALL CONFIDENTIAL INFORMATION OBTAINED IN THE COURSE OF MY ASSOCIATION OR AFFILIATION WITH GOALS AESTHETICS AND PLASTIC SURGERY.

I UNDERSTAND THAT INAPPROPRIATE USE OR RELEASE OF CONFIDENTIAL INFORMATION IS GROUNDS FOR IMMEDIATE TERMINATION AND THAT ANY SUCH INAPPRORIATE USE OR RELEASE OF CONFIDENTIAL INFORMATION WILL SUBJECT ME TO POSSIBLE CIVIL AND CRIMINAL PENALTIES.

SIGNED AND AGREED: _____

Date: _____

## SCHEDULE D: NON-SOLICITATION AGREEMENT

NYC MEDICAL PRACTICE P.C. d/b/a GOALS AESTHETICS AND PLASTIC SURGERY ("Practice") and
_____ ("Physician"), set forth the terms and conditions under which the
Physician may solicit the Practice's patients/clients, prospective patients/clients and workforce members.

1.  **Consideration.** In consideration of the Physician's execution of this Agreement, the Physician will be entitled
    to the Compensation and other benefits conferred onto the Physician by the Independent Contractor
    Agreement, to which this Agreement is attached as Schedule D, and which is incorporated herein by reference.

2.  **Defined Terms.**
    a.  **"Competitive Business"** refers to any medical office, medical spa, doctor or practitioner, partnership,
        joint venture, corporation and/or any other entity and/or person and/or any licensee of such entity, that
        provides plastic surgery procedures, medical spa treatments, injectables, and any other procedure or
        treatment that the Practice provides.
    b.  **"Patient/Client"** refers to any person that has been subject to any medical or medical spa procedure or
        treatment from the Practice.
    c.  **"Prospective Patient/Client"** refers to any person that is reasonably expected to subject themselves to
        any medical or medical spa procedure or treatment from the Practice.
    d.  **"Workforce Member"** refers to any of the Practice's administrative and professional employees, medical
        staff and other health care professionals; independent contractor; volunteers; agency, temporary and
        registry personnel; house staff, students, and interns.

3.  **Non-Solicitation of Patients/Clients and Prospective Patients/Clients.**
    a.  The Parties acknowledge that the Physician is an owner of a medical practice known as _____
        (the "Outside Practice" and the Practice has consented to the Physician's ownership, operation and
        practice of medicine on behalf of the Outside Practice.  The Outside Practice shall not be considered a
        Competitive Business. The Physician covenants and agrees that during the term of the Physician's
        relationship with the Practice, and for two (2) years after any termination of such association or
        relationship, the Physician will not, directly or indirectly, solicit or attempt to solicit any business from
        any of the Practice's Patients/Clients or on behalf of themselves or any Competitive Business.
    b.  The non-solicitation restriction set forth in paragraph 4(a) of this Schedule D is specifically limited to
        Patients/Clients of the Practice:
        i.   With whom Physician performed medical services on during the three (3) year period immediately
             preceding the Physician's termination; or

4.  **Non-Solicitation of Practice's Workforce Members.** The Physician covenants and agrees that during the
    term of its relationship with the Practice and for two (2) years after the termination of such association or
    relationship, the Physician shall not, directly or indirectly, on his or her behalf or on behalf of or in conjunction
    with any person or entity, recruit, solicit, or induce, or attempt to recruit, solicit, or induce, any of the Practice's
    Workforce Members to terminate their association relationship with the Practice.

5.  **Injunctive Relief.** The Parties agree that any breach of this Agreement by the Physician will result in irreparable injury to the Practice for which money damages are inadequate or unquantifiable; therefore, in the event of a breach or an anticipatory breach, the Practice will be entitled (in addition to any other rights and remedies which it may have at law or in equity, including money damages) to have an injunction without bond issued enjoining and restraining the Physician and/or any other person involved from breaching this Agreement.

    The Practice shall be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief from the Physician.

6.  **Integration.** This Agreement and the Independent Contractor Agreement to which this Agreement is attached, which is hereby incorporated by reference, constitutes the entire understanding between the Parties and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the Parties with respect to the content herein.

7.  **Severability.** Although the restrictions contained in this Agreement are considered by the Parties to be reasonable for the purpose of protecting the business and good will of the Practice, if any such restriction is found by a court of competent jurisdiction to be unenforceable, such provision will be modified, rewritten or interpreted to include as much of its nature and scope as will render it enforceable to the greatest extent permissible under the applicable law including as to jurisdictional, geographical and temporal limits. If it cannot be so modified, rewritten or interpreted to be enforceable in any respect, it will not be given effect, and the remainder of the Agreement will be enforced as if such provision was not included.

8.  **Waiver.** Any failure by the Practice to enforce the Physician's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

9.  **No Assignments.** This Agreement is personal in nature, and the Physician may not directly or indirectly assign or transfer it by operation of law.

10. **Interpretation.** The headings in this Agreement are for organizational purposes only and should not be used in the interpretation or construction of this Agreement. The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement.

11. **Jurisdiction and Venue.** The parties agree that the interpretation, legal effect and enforcement of this Agreement shall be governed by the laws of the State of New York and each party agrees to the jurisdiction of the courts of New York. The Parties agree that any suit arising out of or relating to this Agreement shall be brought in Kings County, New York.

I HAVE READ AND UNDERSTOOD GOALS AESTHETICS AND PLASTIC SURGERY'S NON-COMPETITION AND NON-SOLICITATION AGREEMENT AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY OF MY OWN CHOOSING.
I UNDERSTAND AND AGREE THAT THE TERMS OF THIS AGREEMENT ARE REASONABLE AND NECESSARY TO PROTECT GOALS AESTHETICS AND PLASTIC SURGERY, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS.

I UNDERSTAND THAT MY VIOLATION OF THIS AGREEMENT WILL RESULT IN IRREPARABLE HARM TO GOALS AESTHETICS AND PLASTIC SURGERY, ITS GENERAL BUSINESS, OWNERS, EMPLOYEES, AND/OR ITS PATIENTS/CLIENTS AND CAN SUBJECT ME TO LITIGATION.

SIGNED AND AGREED: _____
         Date: _____